### GARDNER v. OGDEN et al.

The Supreme Court has jurisdiction to compel the conveyance, by a defendant who has appeared in the suit, of land in a foreign State.

The clerk of a broker employed to make sale of land, who has access to the correspondence between his principal and the vendor, stands in such a relation of confidence to the latter that, if he becomes the purchaser, he is chargeable as trustee for the vendor, and must reconvey or account for the value of the land.

The vendor cannot, it seems, unite in the same action a claim against the broker for damages for having fraudulently sold the land, with a claim against the purchaser for a reconveyance or accounting.

The clerk, in this case, held to reconvey so much of the land as remained in his hands, and to account for the proceeds of what he had sold, although the price paid by him upon the purchase was fair and adequate, and the broker was exonerated from fraud in the sale.

APPEAL from the Supreme Court. Action to avoid a deed as fraudulently obtained from the plaintiff, and to compel the defendant Smith to reconvey to the plaintiff the real estate

therein described, or, as an alternative, that Smith and his co-defendant Ogden should pay the value of the land. Upon the trial before Mr. Justice GOULD, the following facts were proved:

In and prior to the year 1853, the plaintiff, a resident of Troy, in this State, was the owner of sixteen lots of land in the city of Chicago, in the State of Illinois. He had, as early as the year 1851, employed the firm of Ogden, Jones & Co., residing and doing business in the latter city, as his agents to make sale of the lots, whenever practicable, and in the meanwhile to look after them and pay the taxes thereon. The firm was composed of the defendant William B. Ogden, and Mahon D. Ogden and Edwin H. Sheldon. During the years 1852, 1853, and up to July 12, 1854, the defendant Smith and one Franklin Hathaway were clerks of said firm. On the 9th of March, 1852, the firm of Ogden, Jones & Co. addressed to the plaintiff a letter, in which they state that Mr. Ogden had valued the plaintiff's lots at $5,560, and that it was the highest valuation which the lots would bear. It was also stated in this letter that, by forcing the lots on the market, a discount of from twenty-five to thirty per cent would have to be submitted to on this valuation. It was added: "We are of opinion that the coming season will be a favorable one for bringing a portion of this property into market, and making sales at good prices." Ogden, Jones & Co., under date of April 8, 1852, addressed a letter to the plaintiff, which was written by Hathaway and signed by him for the firm, in which they said: "As soon as the block can be re-surveyed and subdivided, we shall be ready to sell. If applications are made for any of your lots, we will at once apprise you, as you desire." On the 24th of June, 1853, the plaintiff again wrote to Ogden, Jones & Co., in which letter he said, that from what he heard of sales of other lots, his were worth $1,000 a lot, or, in the aggregate, $16,000. He wished his sold as near that sum as possible, one-third cash and the balance on interest at two, three or five years. If the offer did not come up to $700, he wished to be advised before concluding the sale. He desired his lots sold as

soon as possible, as he wished to close up his distant matters; that he had fixed the minimum at $500 a lot, but had learned it was too low a figure. He added : " I wish your opinion as to the price and terms on which you can sell my lots, and whether you advise the sale at such prices." Under date of June 30, 1853, Ogden, Jones & Co. acknowledged the receipt of the plaintiff's letter of June 24, and said he was not likely to get $700 each for his lots; that they thought $500 each a fair price on retailing them; that possibly $600 might be got for some of them, and possibly $700 might be obtained for some; that they would make every effort to sell for $700, and would advise of progress. Under date of July 4, the plaintiff wrote them that he thought he had better hold on to his lots, than sell them at retail for $500; that if within the year 1853 they would bring $9,000 or more, he would sell on the terms he had before proposed. After January 1, 1854, he would consider of new terms of sale, as he thought the property must advance. On the 6th of October, 1853, the plaintiff wrote Ogden, Jones & Co. that he could sell his lots for a fine $8,000 house in Troy; that if they could sell them for $500 each, or within $500 of it, on notes payable in Troy, Albany or New York, at three, six, nine and twelve months, he authorized them to do so, on those terms. He added: " As I may not exchange, and pre-fer to sell outright, please to see what you can do by October 25th." On the 26th of October, 1853, the receipt of this letter was acknowledged by Ogden, Jones & Co., in a letter to the plaintiff. It was written by Hathaway, their clerk, in their name. In it they said: " We have now to report an offer made by Mr. Henry Smith for your lots, as follows: He proposes to give you $7,500, payable at the end of five or six years. If this offer is accepted, we will at once prepare the necessary papers, and see that the security is ample." They added: " We doubt whether a better offer than this can now be obtained, as it is larger than the price paid for Mr. Heartt's block 3 in same addition. An early answer is desired." The plaintiff answered this letter, as it is to be inferred, during the same month of October, as his letter commenced, " Yours of the 26th

*inst.* is received." In it he said: "The sale will do. I sell, as I am far off, and give the buyer a good bargain." On the 1st of December, 1853, the plaintiff again wrote to Ogden, Jones & Co., inclosing a deed for the premises, and requesting the securities to be forwarded to him. He again wrote to them on the 11th January, 1854, not hearing from them in reply to his letter of December 1st, and requested their immediate attention to the matter. On the 13th January, 1854, Hathaway, as cashier of Ogden, Jones & Co., acknowledged the receipt of these letters, and stated that a contract of sale, pursuant to the plaintiff's letter of November 12, had been executed by Mr. Sheldon on his part, and by Smith the purchaser, and that, owing to Smith's absence, they had been unable to get the mortgage executed; that it would be done as soon as Smith returned, and the papers would be sent to the plaintiff. On the 13th of February, 1854, Hathaway again wrote to the plaintiff that Smith was still absent in New York, and that when he returned the mortgage would be executed. On the 10th April, 1854, the plaintiff again wrote to Ogden, Jones & Co., requesting the bond and mortgage to be sent; and on the 26th of May he again wrote to them, stating that he was in receipt of their letter of May 22, 1854, inclosing a note for $7,500, and the mortgage. In this letter he said, that a reference to the deed he had sent settled the question that the purchaser of the lots made certain taxes thereon the debt of Mr. Smith and Mr. Hathaway, "who now, by the note and mortgage received by me yesterday, appear to be joint purchasers of my lots in Mr. Smith's name." On the 12th of June, 1854, the plaintiff advised Ogden, Jones & Co. of his dissatisfaction with the sale to Smith and Hathaway, and advised them also of his dissent thereto. The precise time when the mortgage by Smith and wife, and the note of Smith and Hathaway to the plaintiff, were given, did not appear. As they were promised frequently to be sent to the plaintiff as soon as executed, and were sent to him in a letter under date of May 22, 1854, it is inferable they were executed about that date. On the 24th and 25th of March, 1854, Smith, by M. D. Ogden as his attorney, sold portions of

Gardner *v.* Ogden.

the lots purchased of the plaintiff for the sum of $8,250; and on the 3d of May, 1854, Hathaway, as Smith's agent, sold another portion thereof for the sum of $1,000. The portions so sold were nine lots of the sixteen originally held by the plaintiff. This action was commenced against the defendants Ogden and Smith; and in the complaint the plaintiff prayed that said Smith might set forth whether he had sold said plaintiff's lots, when and to whom, and for what price, and that plaintiff might have judgment setting aside said deed to Henry Smith, and declaring said sale to said Smith to be void, and that he reconvey said sixteen lots to the plaintiff unincumbered and with the same title that the plaintiff conveyed to him, or that said Smith and Ogden should pay to the plaintiff the highest value of the said sixteen lots at the time of the commencement of this action or at any time subsequent, and that they pay the costs of the action. On their compliance with such judgment, the plaintiff offered to surrender the mortgage and note received by him. The defendants answered, denying all fraud; and the defendant Smith, in his answer, admitted that he and Hathaway were clerks of Ogden, Jones & Co. during the year 1852 and up to July 12, 1854. Smith also set up, in his answer, that, after the sale and conveyance by the plaintiff to him, he had sold and conveyed by contract for deeds a part of said lots to divers persons in good faith, and that the legal possession and occupancy of a portion of said lots were, at the time of his answering, in persons other than himself, and that a portion of said lots had been built upon and otherwise permanently improved by the purchasers thereof.

The judge at special term found the value of the lots, at the time of the trial (April 18, 1856), to be $15,000, and made a decree that the defendants Ogden and Smith should pay to the plaintiff that sum, with interest from that date, or, instead of paying that sum, Smith, if he should elect so to do, might reconvey to the plaintiff such portions of the said lots as he had not sold and conveyed, by a good title free of incumbrance, and transfer and assign to said plaintiff all the contracts made and entered into by him for the sale of any part of said lots, and

pay over all sums of money which he, Smith, had received on such sales, with interest thereon from the time of such receipt: such reconveyance and payment to be a satisfaction of said decree, so far as said damages and interest were concerned. And said defendants were also decreed to pay the plaintiff's costs. It was further provided in the judgment that, in case of such reconveyance, assignment and payment, the plaintiff should accept the same in full of said $15,000 and interest; and on payment thereof and compliance by the defendants with the decree, the plaintiff was directed to cancel the mortgage of the defendant Smith and wife, and deliver up to him his and Hathaway's note.

From this decree the defendants appealed. The court, at general term in the third district, reversed the judgment, upon questions of fact, and ordered a new trial. The plaintiff appealed from that order to this court, and stipulated, if the order should be affirmed, that judgment absolute might be entered against him.

*William Curtis Noyes,* for the appellant.

*John H. Reynolds,* for the respondents.

DAVIES, J. The first question necessary to be considered is, whether the Supreme Court had jurisdiction of the subject matter of this action. That court, under the reorganization of the judicial system of this State, under the Constitution of 1846, succeeded .to all the powers of the Court of Chancery, and to all the jurisdiction which it possessed and was accustomed to exercise. This question caused embarrassment to the special term in this case; and it seemed to doubt its power to order in direct terms the defendants, or either of them, to reconvey the premises deeded by the plaintiff to Smith, on the ground that the court had no jurisdiction, for the reason that the lands, the subject matter of the action, were situated without the boundaries of the State. The Supreme Court, at general term, in its opinion, says: "If the sale to Smith could be

avoided on the ground of the relation in which he stood to Ogden, Jones & Co., the action for that purpose should have been prosecuted against Smith alone, and before some tribunal having cognizance of the subject matter of the action. The premises being in another State, an action for their recovery cannot be successfully prosecuted in this court." In this view of the authority of the Supreme Court to entertain this action, we think the learned courts below fell into a grave error. It is true that, by section 123 of the Code, actions for the recovery of real property must be tried in the county in which the subject of the action is situated. The Supreme Court of this State, as a court of equity, could not, therefore, take jurisdiction of an action for the recovery of lands situated in another State, where the proceeding was *in rem;* but where it has jurisdiction of the proper parties, it may, by its judgment or decree, compel them to do equity in relation to lands located without its jurisdiction. The court, in such a case, acts *in personam.* We regard this as so well settled by authority, that it cannot longer be seriously questioned. A review of the authorities in England and this country will, we think, place this matter beyond all doubt. In *Archer* v. *Preston,* in which case, if in any, the jurisdiction was local, the matter there being not only for land that lay in Ireland, but of a title under the act of settlement there, yet the defendant coming into England, a bill was exhibited against him there, and a *ne exeat regno* granted, and he put to answer a contract made for those lands. This case is cited by Lord Chancellor NOTTINGHAM in *Count Arglasse* v. *Muschamp* (1 Vern., 75), and by Lord Keeper NORTH in *S. C.* (1 Vern., 135). *Arglasse* v. *Muschamp* was a case in which the plaintiff exhibited his bill to be relieved against an annuity or rent-charge made upon lands in Ireland, on the ground that the same was obtained by fraud. The defendant pleaded to the jurisdiction of the court that, the lands lying in Ireland, the matter was properly examinable in the Court of Chancery there, and that that court in England ought not to interpose. The Lord Chancellor said: "This is surely only a jest put upon the jurisdiction of this court by the common

lawyers; for when you go about to bind the lands, and grant a sequestration to execute a decree, then they readily tell you that the authority of this court is only to regulate a man's conscience, and ought not to affect the estate, but that this court must *agere in personam* only; and when, as in this case, you prosecute the person for a fraud, they tell you, you must not intermeddle here, because the fraud, though committed here, concerns lands that lie in Ireland, which makes the jurisdiction local, and so would wholly elude the jurisdiction of this court. But," he adds, "they certainly forget the case of *Archer and Preston (supra)*"; and the plea was overruled, and the defendant ordered to pay costs for endeavoring to oust the court of its jurisdiction. This was in Michaelmas term, 1682. Lord NOTTINGHAM died in December of that year, and was succeeded by Lord Chief Justice NORTH as Lord Keeper. In the succeeding term (Hilary, 1682), a petition was presented to the Lord Keeper by the defendant for a rehearing of his plea to the jurisdiction of the court; but it was not allowed; the Lord Keeper citing only *Preston and Archer's case.* In the case of *Earl of Kildare* v. *Eustace* (1 Vern., 404), the plaintiff's bill was to be relieved touching the trust of certain lands in Ireland. The defendants had appeared, and had not objected to the jurisdiction of the court; and the case coming on to be heard, the Lord Chancellor, JEFFRIES (in Michaelmas term, 1686), objected that the court could not hold pleas of lands in Ireland. The plaintiff's counsel insisted that he was entitled to relief in that court by reason that both plaintiff and defendant were there in England, and that a court of equity does only *agere in personam;* and the counsel instanced the precedents of *Arglasse* v. *Muschamp (supra)*, and *Arglasse* v. *Pitt* (1 Vern., 238), and *Archer's case*, and insisted there would be a failure of justice if the action was not sustained. But the Lord Chancellor overruled the plaintiff's counsel, and said, in the cases of *Lord Arglasse* the fraudulent contracts were made here in England, and thereupon pronounced a rule for dismissing the bill, but, upon the importunity of the plaintiff's counsel, gave them a week's time to search for precedents. The

same case again came up on the 3d of December following, when the Lord Chancellor and the judges then attended with precedents, and Sir JOHN HOLT argued for the plaintiff the preliminary point only, to wit, whether the court had jurisdiction and might hold pleas of the lands which lay in Ireland. The defendant's counsel in a manner waived the preliminary point, and would not enter into the debate whether the court might not decree the trust of lands in Ireland, the trustee living here. After a long debate the judges, concurring with his lordship that the court had a proper jurisdiction in that case, made a decree for the plaintiffs. *Toller* v. *Carteret* (2 Vern., 494), was heard before Lord Keeper COWPER, in May, 1705. The defendant Carteret was the owner of the Isle of Sarke, and made a mortgage thereon to one Willows, the plaintiff's intestate, for five hundred years, for £500. A bill was filed in the Court of Chancery in England that the defendant might redeem or be foreclosed. The defendant pleaded to the jurisdiction of the court, that the island of Sarke was part of the Duchy of Normandy, and had laws of their own, and was under the jurisdiction of the courts of Guernsey, and not within the jurisdiction of the Court of Chancery. The Lord Keeper overruled the plea, because the grant was of the whole island, and, secondly, that the Court of Chancery had also jurisdiction, the defendant being served with the process here, *et æquitas agit in personam*. The case of *Lord Baltimore* v. *William Penn* (1 Ves., Sr., 444), is worthy of attentive consideration. This was a bill filed in Chancery for a specific performance of articles settling the boundaries of the colonies of Maryland and Pennsylvania, made and executed between the respective proprietors thereof. Two objections to the jurisdiction of the court were taken: First. That the court had not, and ought not to take, jurisdiction, for that the same was in the King and Council; Second. That the agreement ought not to be carried into execution by the court, as it affected the estates, rights and privileges of the planters, &c., without the district, and the laws by which they live. The case seems to have been ably argued and maturely considered; for Lord HARDWICKE says, in the

commencement of his opinion, that he had directed the cause to stand over for judgment, not so much from any doubt of what was the justice of the case, as by reason of the nature of it, its great consequence and importance, and the great labor and ability on both sides; it being for the determination of the right and boundaries of two great provincial governments and three counties—of a nature worthy of the judicature of a Roman senate, rather than of a single judge; and he says: "My consolation is, that if I should err in my judgment, there is a judicature, equal in dignity to the Roman senate, that will correct it." He fully sustains the jurisdiction of the Court of Chancery, and, at page 447, says: "The conscience of the party was bound by this agreement, and being within the jurisdiction of this court, which acts *in personam*, the court may properly decree it as an agreement, if a foundation for it." In answer to the arguments that the court had no means to enforce its decree, he says: "If they could not at all, I agree it would be in vain to make a decree, and that the court cannot enforce their own decree *in rem* in the present case; but that is not an objection against making a decree in the cause, for the strict primary decree in this court, as a court of equity, is *in personam.* \* \* \* In Lord KING's time, in the case of *Richardson* v. *Hamilton*, Attorney-General of Pennsylvania, which was a suit of land and house in the town of Philadelphia, the court made a decree that it could not be enforced *in rem.* In the case of *Lord Anglesey*, of lands lying in Ireland, I decreed for distinguishing and settling the parts of the estate, though impossible to enforce that decree *in rem;* but the party being in England, I could enforce it by process of contempt *in personam* and sequestration, which is the proper jurisdiction of the court." To the same point may be cited the cases of *Earl of Derby* v. *Duke of Athol* (1 Ves., Sr., 202), *Lord Cranstown* v. *Johnson* (3 Ves., Jr., 170), and *Lord Portarlington* v. *Soulby* (3 Mylne & K., 104). The case of *Massie* v. *Watts* (6 Cranch, 148), is quite in point. There a bill was filed in the Circuit Court of Kentucky against the defendant, a citizen of Kentucky, to compel him to convey to the plaintiff lands in the State of

Gardner *v.* Ogden.

Ohio to which the defendants had obtained the legal title, the plaintiff claiming to be equitably entitled thereto. The Circuit Court sustained the bill, and made a decree that the plaintiff recover of the defendant Massie the lands claimed, and convey the same to him; and that upon such conveyance being made, the plaintiff should assign to the defendant all his claim to another quantity of land mentioned in the decree. From this decree an appeal was taken to the Supreme Court of the United States, and there affirmed. MARSHALL, Ch. J., in delivering the opinion, says: "Where the defendant in the action is liable to the plaintiff, either in consequence of contract, or as trustee, or as the holder of a legal title acquired by any species of *mala fides* practised on the plaintiff, the principles of equity give a court jurisdiction wherever the person may be found; and the circumstance that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest jurisdiction." He then reviews the English cases already adverted to, and concludes, on the point of jurisdiction, by saying that, upon the authority of those cases and of others which are to be found in the books, as well as upon general principles, the court was of opinion that, in case of fraud, of trust, or of contract, the jurisdiction of a Court of Chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree. In that case, the court held Massie to be the agent of O'Neal, the plaintiff's grantor, and to whose rights the plaintiff had succeeded, and that, having obtained a patent for land in his own name, which his duty required him to obtain for O'Neal, he must convey the land covered thereby to the plaintiff. The court say: "According to the clearest and best established principles of equity, the agent who so acts becomes a trustee for his principal. He cannot hold the land under an entry for himself, otherwise than as trustee for his principal."

In *McDowell* v. *Read* (3 Louis. Annual R., 391), the Supreme Court of that State held that when a court is called upon to enforce a right, it may avail itself of its jurisdiction over

the person to do justice relative to a subject matter beyond its jurisdiction, though lands be affected by the decree. The case of *Mussina* v. *Alling* (11 Louis. An. R., 568), has been cited as holding a contrary doctrine. I think the leading opinion in this case, upon this point, proceeds upon the assumption that the courts of that State do not possess the chancery powers vested in the Court of Chancery in England. The judge who delivered the opinion in that case says that the people of Louisiana have always resisted the foreign modes of procedure, and especially the peculiar doctrines and forms of chancery; that, although the courts of that State have equity and common law jurisdiction, it does not follow that all the prerogatives claimed by courts of common law and courts of chancery, and all their artificial rules and peculiar dogmas, should be usurped by the courts of Louisiana. The learned judge seemed to think that if a contrary doctrine were adopted, the courts of New Orleans might be occupied " with investigation of land titles all round the world." In *Farley et al.* v. *Shippen et al.* (1 Wythe's R., 254), the Court of Chancery in Virginia held that it had jurisdiction to enforce a trust in relation to lands lying in North Carolina, the defendants being amenable to its process. To the same effect is the case of *Guerrant* v. *Fowler* (1 Hen. & M., 5). So, also, *Hughes* v. *Hall* (5 Munf., 431).

The current of decision in this State, upholding the jurisdiction of our courts upon this question, has been uniform. I am unable to find that any of the learned judges of our courts, who have examined the question and expressed an opinion upon it, have given it hesitatingly or doubtfully, except in the present case. I think all the cases in the State speak a uniform language, and give out no uncertain sound. The earliest case is that of *Dale et al.* v. *Roosevelt* (5 John. Ch. R., 174), where Chancellor KENT, in 1821, granted an injunction to restrain any suit upon an agreement relating to lands in the State of Ohio. The jurisdiction of the court was distinctly affirmed by Chancellor SANFORD, in *Ward* v. *Arredondo* (Hop. R., 213). In that case, the land was in the State of Florida, and the parties in this State; and the bill was filed to cancel a

deed and restrain an agent of the grantor from parting with it. I am unaware that the authority of this case has ever been questioned in this State: on the contrary, it has been frequently affirmed. (*Mead* v. *Merritt & Peck*, 2 Paige, 402; *Mitchell* v. *Bunch*, 2 id., 606; *Sutphen* v. *Fowler*, 9 id., 280; *Shattuck* v. *Cassidy & Smith*, 3 Edw., 152; *De Klyn* v. *Watkins et al.*, 3 Sand. Ch. R., 185; *Newton* v. *Bronson*, 3 Kern., 587.) In this last case, this court says that the doctrine established is that the Court of Chancery, having jurisdiction of the person of the defendant, will, by its process of injunction and attachment, compel him to do justice by the execution of such conveyances and assurances as will affect the title of the property in the jurisdiction in which it is situated. This court also held, in that case, that the present Supreme Court possesses the jurisdiction formerly exercised by the Court of Chancery. It also disposes of the application of section 123 of the Code to a case like that under consideration. As sustaining the same general doctrine of all these cases, I will only refer to an additional case—that of *D'Ivernois* v. *Leavitt* (23 Barb., 63).

These cases must be held to establish the jurisdiction of the Supreme Court, in the present case, on an impregnable basis, and that the court, having jurisdiction of the party in whom the legal title to the land in controversy is vested, may, by its process of attachment and injunction, compel him to do justice by the execution of such conveyances and assurances as will affect the title to them in the State of Illinois.

It is appropriate here to examine into the nature and character of the complaint in this action, and the grounds upon which it is sought to make the respective defendants liable. The defendant Ogden is charged with a fraud in having made sale, by himself or his partners, of the plaintiff's lands, at a price far below their actual value, and when they knew that they were selling in an advancing market; that the firm, including Ogden, was interested in the purchase by Smith and Hathaway, their clerks, and that the sale was made to them to defraud the plaintiff; and the plaintiff claims to recover of Ogden the highest price which the land has attained, by reason

of his fraudulent disposition of it. The plaintiff's ground of claim against Smith is, that he stood in such relation of confidence to the plaintiff that, in making the purchase, the law adjudges that he holds the subject matter of it as the plaintiff's trustee, and that the plaintiff can call him to account as such. This the plaintiff can do, if such relation of confidence subsists, by requiring a reconveyance of the property, if that be practicable, with an account and payment of the rents and profits accruing during the time it was held by the trustee, or, if that is not practicable, by calling on the trustee to account and pay over to his *cestui que trust* all that he has realized, or ought by due diligence to have realized, from the trust estate. In the present case, the plaintiff has elected to regard Smith as his trustee; and his complaint as to him, and the decree of the special term, proceeds on this basis. The plaintiff, therefore, elects to affirm the sale made to Smith. He cannot, *uno flatu*, affirm it as to him, and disaffirm it as to the defendant Ogden. It is difficult to see how, under the provisions of section 167 of the Code, these causes of action may be united in the same complaint. Although it may be said that both causes of action arise out of the same transaction, to wit, the sale of the plaintiff's lands to the defendant Smith, yet the cause of action against Ogden is for an injury to the plaintiff's property, while that against Smith is a claim against him as a trustee by operation of law. The causes of action joined in this complaint do not affect both of the parties defendant. Ogden is not affected by, or in any way responsible for, Smith's acts as the plaintiff's trustee, and the complaint does not profess to make him liable therefor. So, Smith is not sought to be made responsible for the fraudulent acts of Ogden. On the plaintiff's own showing, he has separate and distinct causes of action against each of the defendants, and which cannot be joined under the Code. The issues are separate : the relief prayed against each is distinct and different; and the proofs relied on to maintain each issue are of an entirely dissimilar character.

We have looked into the testimony in the case, to ascertain if the charge of fraud against the defendant Ogden is sustained

by the testimony. As to any personal fraud, it is clear he was not guilty of any, for he was absent in Europe during all the time the negotiations of his firm with Smith, for the sale of the plaintiff's lands, were carried on, and did not return until about the time the complaint in this action was verified. The plaintiff entirely failed to show any fraud on the part of the firm or the defendant Ogden, of such a character as would make them responsible in damages for the sale of the lands to Smith. The testimony fully sustains the position that, at the time of the sale, the price paid, or agreed to be paid, was fair and adequate, and that the purchase money was adequately secured; and it fails to show that Ogden's firm, or any member of it, had any interest in the purchase. The affirmance of the sale by the plaintiff is a complete answer to the claim for damages against the firm for fraud in making the sale. In the case of *Watts* v. *Massie* (*supra*), one Anderson, who made the survey which, it was alleged, Massie had located in his own name instead of that of his principal, was made a party defendant, charging him with fraud in making the survey. On the hearing, the complaint was dismissed, with costs, as to Anderson, and a decree made against Massie, which was affirmed by the Supreme Court on appeal. A proper disposition of this cause, as to the defendant Ogden, would have been to have dismissed the complaint as to him. The Supreme Court, at general term, having reversed the judgment of the special term and granted a new trial, and the plaintiff having appealed therefrom, and stipulated that, if it should be affirmed, judgment absolute might be rendered against him, it is now proper to affirm that order as to the defendant Ogden, and render judgment absolute in his favor, by dismissing the complaint as to him, with costs.

It only remains now to consider the cause of action against the defendant Smith. It proceeds upon the ground that Smith stood in such relation of confidence to the plaintiff that the purchase made by him was made as the plaintiff's trustee, and that he can derive no benefit therefrom. This leads to an examination of the main and important question in the case.

It is to be observed, in the commencement, that Ogden, Jones & Co. were the conceded agents of the plaintiff: as such, they owed a duty to him to manage and dispose of his property to the best advantage.   It is admitted by the answer that Hathaway and the defendant Smith were clerks of the firm during the years 1852, 1853, and up to July 12, 1854.   As such, they, of course, had access to the correspondence of the firm, were well acquainted with the plaintiff's urgency to sell, his motives for so doing, and all the facts and circumstances connected with the property known to the plaintiff's agents; and, as the clerks of the firm, they owed the same duty to the plaintiff. This view is much strengthened by the circumstance that all the correspondence with the plaintiff relating to the sale was carried on by Hathaway in the name of the firm; though, in the important letter of October 26, 1853, his name does not appear as the writer.   It was written, apparently, by the firm, and signed in their name.   A circumstance is disclosed in the proof, which tends strongly to the inference that Hathaway was either interested in this purchase from the beginning or intended so to be.   I am strongly impressed with the conviction that he was originally a party in interest.   It appears that the plaintiff and his sister, Mrs. Hall, were the owners jointly of block No. 1, Carpenter's addition, in Chicago, and of lots 4 and 5 in block 17; that the firm of Ogden, Jones & Co. had charge of this property, and, in the spring of 1852, they made partition thereof between Mrs. Hall and the plaintiff, valuing each share at $5,560.   Hathaway, in the letter of January 13, 1854, informs the plaintiff that he had become the owner of Mrs. Hall's lots; and this circumstance presents a motive on his part to become the owner of, or interested in, the share of the lots owned by the plaintiff.   In addition to this, he became equally bound, with Smith, for the payment of the purchase money, and this, coupled with the conceded fact that he is now interested with him, leads to the inevitable conclusion that he was so originally, or, at least, intended to be.   If Ogden, Jones & Co. had become the purchasers, instead of their clerks Smith and Hathaway, what would have been the plaintiff's rights in

the premises?   The rule is clearly laid down by that learned and eminent writer, Lord St. Leonards, in his work on Vendors and Purchasers. (See Sugden on Vend. and Pur., 13th ed., 566.)   He says: "It may be laid down as a general proposition that trustees, who have accepted the trust (unless they are nominally such, as trustees to preserve contingent remainders), agents, commissioners of bankrupts, assignees of bankrupts or their partners in business, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of sale, counsel, *or any persons who, being employed or concerned in the affairs of another, have acquired a knowledge of his property,* are incapable of purchasing such property themselves, except under the restrictions which will shortly be mentioned.   For, if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not to exercise it for the benefit of the persons relying on their integrity.   The characters are inconsistent.   *Emptor emit quam minimo potest, venditor vendit quam maximo potest.*"

In *Fox* v. *Mackreth* (2 Bro. C. C., 400), it was held by the Master of the Rolls (afterwards Lord Kenyon), and Lord Chancellor Thurlow, that a trustee for the sale of estates for the payment of debts, who purchased them himself by taking undue advantage of the confidence reposed in him by the plaintiff, and who resold the same premises at a greatly advanced price, should be regarded as a trustee, as to the sums produced by such second sale, for the original owner.   This decree was affirmed in the House of Lords, in March, 1791. (4 Brown P. C., 258.)   Soon after this, Mackreth, the delinquent trustee, smarting under the just principles of law laid down by the courts, sought to avenge himself for the wrong which he imagined had been done to him, by challenging Sir John Scott, afterwards Lord Eldon, one of the leading counsel for Fox the plaintiff.   No notice was taken of this challenge by Sir John Scott. (Twiss' Life of Lord Eldon, vol. I, p. 218.) And this case has ever remained as a leading authority, and one of peculiar interest.

In *Hall* v. *Noyes* (3 Brown C. C., 483), a bill was filed by a widow of a *cestui que trust*, ten years after the sale of trust property by three trustees to one, and the purchaser was held a trustee for the widow. And it is a fact to be noted, that the price given by the trustee was more than could have been got from any one else.

In *Crowe* v. *Ballard* (3 Bro. C. C., 117), the Lord Chancellor says: "Ballard undertakes to sell a legacy, and pretends he took great pains so to do; then he buys it himself. This is alone sufficient to set aside the transaction. It is impossible, at any rate, that the person employed to sell can be permitted to buy."

In *Whichcote* v. *Lawrence* (3 Ves., 740), the Lord Chancellor says: "The real proposition, which is very plain in point of equity, and a principle of clear reasoning, is, that he who undertakes to act for another in any matter shall not, in the same matter, act for himself. Therefore, a trustee to sell shall not gain any advantage, by being himself the person to buy."

This principle was acted on by Lord KING, in *Keech* v. *Sandford* (Sel. Cas. in Ch., 61), Oct. 31, 1726. He there said: "It might seem hard that the trustee is the only person of all mankind who might not have the lease; but it is very proper that the rule precluding him from purchasing should be strictly pursued, and not in the least relaxed."

In *Whelpdale* v. *Cookson* (1 Ves., Sr., 8), Lord Chancellor HARDWICKE would not allow a purchase by a trustee to stand, although another person, being the highest bidder, bought it for him at a public sale. He said that he knew the dangerous consequences of permitting it; and it was not enough for the trustee to say you cannot prove any fraud, as it is in his power to conceal it. The whole doctrine is very fully reviewed by Lord ELDON, Chancellor, in *ex parte James* (8 Ves., 337).

It were useless to cite all the authorities in the books on this point. A few additional ones, as being of peculiar significance and importance, will be referred to. Notice particularly should be taken of the case of *York Buildings Association* v. *Mackenzie.* It first appeared in 8 Brown's Parliamentary Cases by Torn, in

Gardner *v.* Ogden.

Appendix, 42; but has since been reported in 3 Paton, 378. Chancellor KENT, in *Davoue* v. *Fanning*, says of it that it is a case too important to be omitted. He says that it is a complete vindication of the doctrine he applied in that case, and that, considering the eminent character of the counsel who were concerned in that case, and who had since filled the highest judicial stations, and the ability and learning which they displayed in the discussion, it is, perhaps, one of the most interesting, on a mere technical rule of law, that is to be met with in the annals of our jurisprudence. He added, that the reasons of the House of Lords, for setting aside the sale, are not given, and that we are left to infer them from the arguments upon which the appeal was founded. They have now appeared in the report in 3 Paton. It is stated by the reporter, in a note (1 Macq., 481), that the argument of this case lasted sixteen days, at two sessions of Parliament (1794 and 1795). Judgment was given on the seventeenth. Lord LOUGHBOROUGH was, indeed, Chancellor then; but the tradition is, that Lord THURLOW (who had recently delivered the opinion in *Fox* v. *Mackreth*), took the chief part in the hearing and deliberation. A person present at the time the judgment was pronounced says, in a note to the reporter, " I have a very strong recollection of the very impressive speech of Lord THURLOW on the appeal of the *York Buildings Company* v. *Mackenzie.* I was present. Lord LOUGHBOROUGH, the Chancellor, spoke after Lord THURLOW." The appellants were an insolvent company, and their estate was sold by the order of the Court of Session, at a public judicial sale, to satisfy creditors. The course at such sales is to set up the property at a value fixed upon by the court, which is called the upset price, and which is fixed on information obtained and communicated to the court, by the common agent of the court, who has the management of all the out-door business of the cause. The respondent in the case was the common agent, and he purchased for himself, at the upset price; no person appearing to bid more, and the sale was confirmed by the court; and in the course of eleven years' possession he had expended large sums for buildings and improvements. There

was no question as to the fairness or integrity of the purchase. The object of the appellants was to set aside the sale, on the ground that the purchaser was the common agent in behalf of all parties to procure information and attend the sale, and stood in the nature of a trustee, and, therefore, disabled to purchase. On the part of the appellants it was contended that the sale in question was, *ipso jure*, void and null, because the respondent, from his office of common agent, was under a disability and incapacity which precluded him from being a purchaser. "The office of common agent, in a ranking and sale, infers a natural disability, which, *ex vi termini*, imports the highest legal disability, because a law which flows from nature, being founded on the reason and nature of the thing, is paramount to all positive law; that it is of no moment what the particular name or description, whether of character or office, situation or position, is, on which the disability attaches. "*Tutor, ait Paulus, rem pupilli emere non potest; idemque porrigendum est ad similia, id est, ad curatores, procuratores, et qui negotia aliena gerunt.*" (Lib. 3, § 7, ff. De Contrac. emp., &c.) The reason of this law is implied in the nature of the cases to which it is extended. Its energy does not consist in a distinction of mere words, that a tutor cannot be both seller and buyer; neither does it rest on another applicable enough adage, *Nemo potest in rem suam auctor esse.* This *sententia* of the Roman jurisconsult is, that the tutor cannot buy his pupil's estate, because he has a trust and charge for his pupil, and therefore it is that the law is extended *ad similia*, and to all, *qui negotia aliena gerunt.* By this principle, as the sound and substantial reason of the law, is to be interpreted that other text of the Pandects which says, "*Item ipse tutor, et emptoris et venditoris officio fungi non potest.*" (L. 5, § 7, ff. De Auct. and Cons., Tut. and Cur.) These views were not controverted by the counsel for the respondent; but they insisted that the sale could be maintained on other grounds. The opinions in the House of Lords were given by Lords THURLOW and LOUGHBOROUGH. The former said that all the gentlemen admit that it was the duty of the agent to carry on the sale to the utmost advantage for the benefit of the

creditors and those interested in the residue; and taking it to be so, one side said, that being your situation, it is utterly impossible for you to perform that duty in such a manner as to derive an advantage to yourselves. He said, this seems to be a principle so exceedingly plain that it is, in its own nature, indisputable; for there can be no confidence placed unless men will do the duty they owe to their constituents, or be considered to be faithfully executing it. In these views, the Chancellor concurred; and the sale was set aside. Lord ELDON and Sir W. GRANT designate this as *the* great case, and frequently refer to it; and Lord ST. LEONARDS, in his work on Vendors and Purchasers (vol. 3, 240), calls it likewise the *great* case, and frequently refers to it.

In *Jeffrey* v. *Aitken,* decided in Scotland in June, 1826, the Lord Ordinary observed, it is impossible to hold that the seller can also be the buyer of the subject, after the judgment of the House of Lords in the case of the *York Building Company* v. *Mackenzie.* In *Hughs* v. *Watson,* decided also in Scotland, January 20, 1846, the same rule as laid down in *Mackenzie's case* was reiterated and adhered to. Lord JEFFREY said: " The principle involved in this case is a very familiar and general one in our laws. No person can be *actor in rem suam.* The stringency of the maxim has been ruled and held settled by the House of Lords in the *case of Mackenzie.* \* \* It is now *presumptio juris et de jure,* that where a person stands in these inconsistent relations of both buyer and seller, there are dangers, and it is not relevant to say that it is impossible there could be any in the particular case. I should be sorry to think that any doubt was thrown on this rigorous principle, which has been established both here and in the other end of the island." The whole subject is elaborately reviewed in the case of the *Aberdeen Railway Company* v. *Blaikie Brothers* (1 Macq., 461), decided in the House of Lords, July 20, 1854. Lord CRANWORTH, in his opinion, says: " An agent has duties to discharge of a fiduciary character toward his principal; and it is a rule of universal application that no one having such duties to discharge shall be allowed to enter into engagements in which

he has, or can have, a personal interest conflicting, or which possibly may conflict, with the interests of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into. It obviously is, or may be, impossible to demonstrate how far, in any particular case, the terms of such a contract have been the best for the *cestui que trust* which it was possible to obtain. It may sometimes happen that the terms on which a trustee has dealt, or attempted to deal, with the estate or interests of those for whom he is a trustee, have been as good as could have been obtained from any other person: they may even, at the time, have been better. But still, so inflexible is the rule, that no inquiry on that subject is permitted. The English authorities on this subject are numerous and uniform." In these views Lord BROUGHAM concurred (p. 483). To the same point may be cited *Lewis* v. *Hilman* (3 House of Lords Cases, 607, 629, 630). *In re Bloyes' Trust* (1 Macnaughton and Gordon, 488, at p. 495), the rule is declared clearly and emphatically.

The same line of decision, in this State, has been uniform, and the cases are numerous where it has been recognized, affirmed, and rigorously applied. It would appear to have been first enunciated in the Supreme Court, in *Munroe and others* v. *Allaire*. (Per KENT, J., in *Bergen* v. *Bennett*, 1 Caines' Cases in Error, 19.) It was distinctly recognized in that case, as a sound and established rule. (See pp. 19, 20.) It received the unequivocal indorsement of the Court of Errors in *Munroe* v. *Allaire* (2 Caines' Cases in Error, 183). BENSON, J., in delivering the opinion of the court, says: "It is a principle that a trustee can never be a purchaser; and I assume it as not requiring proof, that this principle must be admitted, not only as established by adjudication, but also as founded in indispensable necessity, to prevent that great inlet of fraud and those dangerous consequences which would ensue if trustees might themselves become purchasers, or if they were not in every respect kept within compass. Although it may, however, seem hard that the trustees should be the only persons

Gardner *v.* Ogden.

of all mankind who may not purchase, yet, for the very obvious consequences, it is proper that the rule should be strictly pursued, and not in the least relaxed." Chancellor KENT, in *Davoue* v. *Fanning*, hereafter cited, says that he cannot but notice the precision and accuracy with which the rule and the reason of it are here stated.

The next case in which this rule is affirmed is that of *Jackson* v. *Van Dalfsen* (5 Johns., 43), in the Supreme Court. The whole subject received a most elaborate and searching examination by Chancellor KENT, in *Davoue* v. *Fanning* (2 Johns. Ch. R., 252). The authorities are fully and carefully reviewed, and the powers of his great mind and his varied learning were brought to bear upon this discussion. It is the great case in our courts on this subject, and it will bear a favorable comparison with any other examination of this question. It settled the rule for this State, and has been recognized and adopted as authority by many of the courts of the sister States.

In harmony with these views are the cases of *De Caters* v. *Le Ray de Chaumont* (3 Paige, 178); *Slade* v. *Van Vechten* (11 id., 26); *Poillon* v. *Martin* (1 Sand. Ch. R., 569); *Jewett* v. *Miller* (10 N. Y., 402); *Van Epps* v. *Van Epps* (9 Paige, 327); *Torrey & Gilbert* v. *Bank of Orleans* (9 id., 649); *S. C.* (7 Hill, 260); *Hawley* v. *Cramer* (4 Cow., 717); *Dobson* v. *Racey* (4 Seld., 216); *Moore* v. *Moore* (1 id., 256).

This subject was very elaborately discussed in the case of *Michoud* v. *Girod* (4 How. U. S., 503). The very able opinion of Mr. Justice WAYNE leaves nothing new to be said. It contains a reference to and review of the cases and text-writers bearing upon the question. Interesting cases on this question may also be found in 9 Barr, 284; 22 Penn., 320; 26 id., 67; and 29 id., 154.

It is undeniable, from these authorities, that if the purchase in this case had been made by the firm of Ogden, Jones & Co., it could not be sustained. Does the same principle apply to the purchase made by Smith, their clerk? It is not perceived upon what substantial ground a distinction can be drawn. Whatever duty his principals owed to the plaintiff, he equally

owed the same. The rule, as we have seen, as laid down by Sugden, and which the authorities sustain, is, that the disability extends to all persons who, being employed or concerned in the affairs of another, acquired a knowledge of his property. Now, it is undeniable that Hathaway and Smith were employed or concerned in the affairs of the plaintiff relating to these lands, and acquired knowledge concerning them. The defendant Smith was the clerk, or assistant, of his principals. He was their agent, and employed in and about their business. Whatever disabilities they labored under, equally attached to him. It would work an entire abrogation of the rule to hold the principal subject to the operation of this rule, and exempt his clerks and agents from its effect. It would be opening the door to its evasion, so that it would lose all its vitality and virtue. The courts have not so dealt with the application of this rule. It has been held that the partners in business of an assignee in bankruptcy are equally disqualified from purchasing as the assignee himself. (*Ex parte Barnett*, 7 Jurist, 116.) It has been held to disqualify the solicitor to a commission in bankruptcy from becoming a purchaser at a sale of the bankrupt's effects. (*Owen* v. *Foulkes*, 6 Ves., 630, n. b.; *Ex parte James*, 8 id., 337; *Ex parte Linwood*, and *ex parte Churchill*, before Lord Rosslyn, cited 8 id., 343; *Ex parte Bennett*, 10 id., 381.) The precise point now under consideration arose before Vice-Chancellor Sandford in *Poillon* v. *Martin* (*supra*), where he held that the clerk of an attorney was as much prohibited from purchasing from a client as the attorney himself; that the principle of the rule extended as well to him as to the attorney himself. I think this is the spirit of all the authorities, and that the honesty and fairness of transactions between principals and their agents demand a firm adherence to these rules, and to bring within their operation, not only the agent himself, but those in his immediate employ, and who are engaged in the transaction of his business, which is, necessarily, the business of the agent's principal. It cannot be disguised that this sale was negotiated by one clerk with another clerk of the plaintiff's agents. All the mischiefs which the rules adverted

to were designed to prevent, are apparent in this case.   Assuming that it has been shown that the purchase made by Smith is obnoxious to the objections which have been urged, it follows that the plaintiff is entitled to a reconveyance of his lands. But as it appears that Smith, by his own act, in selling a portion of the lands, is incapable of doing that equity which the law commands, it follows that the plaintiff is entitled to the proceeds of such sales.   The decree, or judgment, of the special term was, therefore, correct, in requiring him to reconvey to the plaintiff all such portions of the lands as remain unsold, and to account to him and pay over the proceeds of all those parts which have been sold.   We see no objection which Smith can properly make to that part of the decree which gives to him the election to pay to the plaintiff the ascertained value of the plaintiff's lands in lieu of such reconveyance and accounting.

The order at the general term, granting a new trial, so far as it relates to the defendant Smith, is reversed, and the judgment at the special term as to him affirmed with costs.   And the order at the general term, granting a new trial as to the defendant Ogden, is affirmed, and, in pursuance of the plaintiff's stipulation, judgment absolute is rendered against him in favor of the defendant Ogden, by the dismissal of the complaint against him, with costs.

All the judges concurring.

Ordered accordingly.