Hazleton, S.
The petitioner is the former Public Administrator of Suffolk County. His term of office ended on December 31, 1954, and in this accounting proceeding he seeks, among other things, to have his acts approved and his bond discharged, although the administration of this estate is by no means concluded, and is now being completed by petitioner’s successor in office. This court refused to discharge petitioner or cancel his bond, and directed him to turn over to his successor the assets of this estate, as well as those of various other estates he was administering. (See Matter of Krabbe. 208 Misc. 197.)
*812 The special guardian appointed by the court in this proceeding and Johanne Krabbe, an alleged distributee of decedent, have filed objections to the transaction recorded in petitioner’s account concerning the sale of certain assets of the estate consisting of 151 shares of the capital stock of the Peoples National Bank of Patchogue.
The narrative of facts anent which there is no dispute shows that decedent died intestate on June 28, 1953, and that petitioner, as Public Administrator of Suffolk County, qualified on July 20th. Among the assets of the substantial estate were 151 shares of the capital stock of the Peoples National Bank of Patchogue, of which institution decedent had been an honorary vice-president and director. Upon petitioner’s request for information, his own attorney, together with Gr. Howard Hatfield, president of the Peoples National Bank, advised him that $300 per share was a fair price for the said stock. Thereafter, on July 29, 1953, petitioner authorized Mr. Hatfield to sell the 151 shares at $300 despite the fact that the book value at that time was $350.
One hundred forty shares of said stock, along with additional sound securities had been pledged by decedent as collateral with another financial institution, the Patchogue Bank, to secure payment of a demand note. The value of the collateral was far in excess of the face of the note, and although some interest was overdue, presumably because of the illness and subsequent death of decedent, payment of the note was not being pressed. The estate is solvent.
This note was redeemed by petitioner on September 21, 1953, on which date the 140 shares of stock were turned over to the attorney for the petitioner, who, in turn, after obtaining petitioner’s indorsement thereon, delivered same to the president of the Peoples National Bank. The attorney did not receive any receipt for the shares although the records of the bank show the receipt of same on said date.
The remaining eleven shares of said stock, which had not been pledged as collateral for the note, previously on August 13, 1953, had been turned over by the attorney for the petitioner to the president of the Peoples National Bank and sold on September 1,1953, to one of its directors at $300 per share. Within two months after September 21,1953, when the other 140 shares had been delivered to Mr. Hatfield, same had been sold by him through his bank to his wife, to the attorney for the petitioner and said attorney’s wife, to several directors and employees of the bank, and a few of its friends and stockholders at the same *813 price of $300 per share. In January of 1954, the attorney for the petitioner and another buyer of the bank stock were elected directors of the bank. The petitioner was an extremely sick man at the time of these sales and did not know who purchased the shares although his attorney had such knowledge.
When decedent died, he owned one tenth of the 1,500 outstanding shares of stock of the Peoples National Bank, the remainder being owned by about seventy stockholders. On July 20, 1954, precisely one year after the petitioner had qualified as administrator, and only eight months after November 20, 1953, when the remaining single share of decedent’s stock had been sold to an employee of the bank, a stock dividend of 12%%, plus stock rights of one sixth of one share for each share held, was declared at a special meeting of the stockholders, and the capital increased from $150,000 to $200,000. On April 12, 1955, the common stock of the bank was split ten shares for one, or a reduction of the par value of said stock from $100 per share to $10 per share effective April 28,1955. Soon thereafter, in May, 1955, the old shares, such as those delivered to the president of the Peoples National Bank and sold by him through his bank for this estate at $300 per share, were quoted at $650 per share, and when the special guardian filed his objections on June 6, 1955, the price was $758 per share. The difference in value between what the estate received for the stock at $300 per share and what was its selling price comparatively soon thereafter is striking. No minutes of the Peoples National Bank have been submitted to the court to reveal, if they do, when the stock split and the dividend were initially considered. No intimation of any of these transactions was called to the attention of this court, which did not learn of the incident until after this account was filed and examined by the special guardian; nor was this court asked for advice or instructions because of the special circumstances surrounding the transaction. Appraisers were hired and paid without the knowledge or order of this court, and no appraisal or inventory was ever filed. Now that we have the facts, what is the law to be applied?
Did the president of the Peoples National Bank put the interest of the estate first, or did he commingle his own and those of the directors and employees of the bank? The age-old rule that without the knowledge and consent of his principal, an agent cannot act in the same transaction on his own account still stands. There is no doubt as to the fiduciary nature of the relationship existing between the petitioner as representative of this estate and Mr. Hatfield as president of the Peoples *814 National Bank in respect of the 151 shares of its stock. At page 120 of the stenographer’s minutes, Mr. Hatfield testified as follows:
“ The Court: Who asked you that?
“ The Witness: Mr. Terry.
“ The Court: And what did you tell him?
‘ The Witness: I told him from our records and I told him only from our records, that the price had been consistently $300. a share and that I did further feel that it could be sold in smaller lots to a spread out group I think 22 or 23 people who bought, that it made no impact.
“ The Court: And the stock was delivered to you to sell for the Public Administrator?
“ The Witness: That’s right.”
Mr. Hatfield, the president of the Peoples National Bank, the bank itself, its directors, and employees owed to the estate and its administrator, the duty of withholding and foregoing all personal and private interest and of conducting the sale of the stock solely to the advantage of the estate. No detour up his own side street was permitted the agent or any of his associates since his course was fixed and certain, while his actions had to be selfless. If there was any possible conflict of interest between the estate and those who purchased the bank shares, then the sale should not have been made. This law was recently restated by Mr. Justice Ughetta in Matter of Bond & Mtge. Guar. Co. (Half Moon Hotel) (199 Misc. 108) thereafter affirmed by our Court of Appeals (303 N. Y. 423). Granting it would serve no purpose to repeat what has been so well said in that case, nonetheless I cannot refrain from quoting from Justice Ughetta’s decision (pp. 111-112) in the Half Moon case:
“ The principle recognized in Davoue v. Fanning [2 Johns. Ch. 252] was reviewed in Gardner v. Ogden (22 N. Y. 327) and extended in the sense that it was held to include a relationship in which the fiduciary bond is not usually thought of as being as strong as that between a trustee and his cestui qui trust or an executor and the beneficiary of an estate. In that case an owner of lots employed a real estate firm to sell the lots. The firm sold them to a confidential clerk of the firm. The fact that the clerk was the buyer was unknown to the owner of the lots until he received the securities representing a purchase-money mortgage. He thereupon sought relief in equity, asking that the sale be set aside or that he be awarded the value of the land. The court ordered the clerk to reconvey those lots he still had title to, and to pay over the proceeds of the sales of the lots he had sold. ' ]
*815 “ In reaching this result, the court stated the rule that applied to transactions of the kind it had before it and then referred to an unbroken line of cases in this country and in England which adhered to this rule. The statement of the rule, taken from an early treatise, was: ‘ “ It may be laid down as a general proposition, that trustees, who have accepted the trust (unless they are nominally such, as trustees to preserve contingent remainders), agents, commissioners of bankrupts, assignees of bankrupts or their partners in business, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of sale, counsel, or any persons who, being employed or concerned in the affairs of another, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under the restrictions which will shortly be mentioned. For, if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not to exercise it for the benefit of the persons relying on their integrity. The characters are inconsistent.” ’ (P.343.)
“ The cases cited in Gardner v. Ogden (supra) reaffirmed that it did not matter that actual fraud on the part of the fiduciary could not be shown. For example, an opinion of the House of Lords in 1854 stated (cited at 22 N. Y. 347-348): ‘ “ An agent has duties to discharge of a fiduciary character toward his principal; and it is a rule of universal application that no one having such duties to discharge shall be allowed to enter into engagements in which he has, or can have, a personal interest, conflicting, or which possibly may conflict, with the interests of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into. It obviously is, or may be, impossible to demonstrate how far, in any particular case, the terms of such a contract have been the best for the cestui que trust which it was possible to obtain. It may sometimes happen that the terms on which a trustee has dealt, or attempteed to deal, with the estate or interests of those for whom he is a trustee, have been as good as could have been obtained from any other person; they may even, at the time, have been better. But still, so inflexible is the rule, that no inquiry on that subject is permitted. The English authorities on this subject are numerous and uniform.” ’ ”
Soon after the filing of the objections by the special guardian, the attorney for the petitioner voluntarily returned the fourteen shares which he and his wife had purchased. Although said attorney maintains that the purchase was in good faith and for *816 what he then considered to be fair value, and that he believes the transaction to have been proper and free of harm to the estate, it is to his credit that he seeks, by the return of the stock, to avoid any possible criticism. This court accepts his explanation and commends him for his voluntary action in taking steps towards rectifying a most disturbing situation.
The nature of the position of said attorney in this transaction did not differ in essence from that of the president of the Peoples National Bank, whose status as agent made him a fiduciary. Therefore, the bank president, the bank itself, its officers, directors and employees should not have bought the shares without the full knowledge and consent of all parties interested in the estate. Hence it is to be hoped that the other purchasers of stock, through the bank president as agent, will heed the example set by the attorney for the petitioner in returning his shares, and go and do likewise.
The objections to the accounts are sustained to this extent: that this court holds the sale of the shares of stock of the Peoples National Bank of Patchogue to any officer, director, stockholder or employee of said bank or to a spouse of any of said group, improper and voidable.
Therefore, the present Public Administrator is hereby instructed to take such steps as may be necessary to rescind those sales of shares of stock of the Peoples National Bank of Patchogue as come within the terms of this decision.
Proceed accordingly.