Freedman, J.
The learned chief justice who determined these motions and made the order appealed from, deemed it unnecessary to consider the technical objections advanced by the railroad company, but placed his decision upon the ground that the examination of the causes cited on the hearing had failed to satisfy him that, where the causé of action has reference to the obligations and business of a corporation created and conducting its business in another State, and where the relief>is of the character sought in this action, this court has jurisdiction, or that such jurisdiction can be obtained by the steps or proceedings taken by the plaintiff in this action. In other words, the decision went upon the ground that the railroad company being a foreign corporation, the courts of this State neither have jurisdiction of the, subject matter of the action, nor can they obtain jurisdiction by the service of process upon the president of the company.
As to the jurisdiction of the subject matter.
The distinction between local and transitory actions has always been recognized by the best elementary writers. The distinction taken is this, that actions are *385 deemed transitory, where the transactions on which they are founded might have taken place anywhere, but are local where their cause is in its nature local.
In the case of Livingston v. Jefferson (1 Brockenb. 203), which was guare clausum fregit brought against a former president of the United States for removing the plaintiff from the Batture in New Orleans, the suit was instituted in the circuit court of the United States for the district of Virginia, in which district the ex-president resided, and the sole question presented for consideration was, whether such an action could be sustained out of the territory where the alleged injury to the real estate was committed. Chief Justice Marshall enforced the distinction between transitory and local actions, as stated above, and held that, although the distinction was merely technical, where the action was instituted to recover damages from the person who had done the local injury, and not to recover the property, which had a fixed locality, the law was too well settled to allow it to be changed by the courts.
The distinction made has also been recognized by the courts of this State.
Watts v. Kinney (6 Hill, 82), was an action on the case for an injury to real property in New Jersey, by diverting water from the plaintiff’s mill, and the action was held to be local, not only by the provisions of the Revised Statutes, but also by the settled rule of the common law, and therefore not within the jurisdiction of the courts of the State of New York.
In People v. Central R. R. Co. of New Jersey (42 N. Y. 283), it was decided that the courts of the State of New York have no jurisdiction to restrain the erection or order the removal of structures extending into the bay or river from the Jersey shore, even if they are a public nuisance, and notwithstanding the fact that, pursuant to an agreement or treaty made between the States of New York and New Jersey in 1833, the State *386 of New York has exclusive jurisdiction over the waters, to low water mark, on the New Jersey shore, and over ships, vessels and craft of every kind afloat in the bay of New York and Hudson River, south of Spuyten Duyvil Creek, for quarantine or health purposes, the protection of passengers and property, to secure the interests of trade and commerce, and to preserve the public peace.
Chase v. Vanderbilt (37 N. Y. Super. Ct. [5 J. & S.) 334], presented, on demurrer, a controversy between stockholders and the directors of the company, a foreign corporation, as to the management of the internal affairs of the company, and it was held that so far as the plaintiff’s right to any judgment involved the performance of an act to be done by the corporation, in its corporate capacity, in a foreign State, it was a matter not in the jurisdiction of the courts of this State, and •that such jurisdiction could not be obtained by acting -on its directors.
In the case of American Union Telegraph Co. v. Middleton (decided by the Court of Appeals in March, 1880), the action was brought to recover damages for wrongfully and maliciously cutting down and unlawfully carrying away and converting twenty-three telegraph poles, wires and insulators attached thereto, located in the State of New Jersey, and forming a part .of a continuous line of telegraph in operation in that State. An order of arrest was granted, the defendant held to bail, and a motion to vacate was denied. The (defendant appealed to the general term, where the order was affirmed, and an appeal taken to the court of appeals. The question presented was, whether an order of .arrest can be lawfully granted in such a case. The court of appeals held: “The telegraphic poles, with wires and attachments theréto, which, it is alleged, were cut .down by the defendant, were affixed to the soil, and constituted a part of the freehold (Electric Telegraph *387 Co. v. Overseers, 24 L. J. N. S. 146). As they could not be cut down without an entry on the realty, and this constitutes a material part of the damages, the only action which can properly be brought is an action of trespass quare clausum fregit. This is clearly manifest, and as such action is local in its character, by the statute as well as by the common law, it will not lie in this State where the land is located in another State (Watts v. Kinney, 23 Wend. 484). In the case last cited it was held that although the courts will entertain actions which are in their nature transitory, notwithstanding they arise abroad, actions for trespass quare clausum fregit, ejectment, &c., where the land lies in a foreign country, cannot be tried here. It is claimed that the damage to the real estate is not the cause of the action, and as these tortious acts were committed upon the highway where the defendant had a right to be, there could be no trespass on the close. The answer to this position is, that the plaintiffs had affixed their poles to the realty, and the cutting away of the same was a trespass, for which damages could only be recovered by an action quare clausum fregit.”
The distinction between transitory and local actions in no way depends upon the difference between equitable and common law jurisdiction. The cases of People v. Central R. R. Co. of New Jersey (42 N. Y. 283), and Northern Indiana R. R. Co. v. Michigan Central R. R. Co. (15 How. U. S. 233), leave no doubt that whether the relief sought be at law or in chancery, the question of jurisdiction equally applies. Nor can this' question of jurisdiction be entirely overcome by a literal construction of section 427 of the old Code, which is still in force, and of section 263 of the Code of Civil Procedure, which provide that an action against a foreign corporation may be brought by a resident of this State, or a resident within the territorial jurisdiction of any of the superior city courts, for any cause of action. *388 The words, ‘ ‘ For any cause of action, ’ ’ must be deemed to mean any cause of action within such jurisdiction of the court as the State has power to confer, and actually, has conferred, upon it.
But while the distinction between transitory and local actions has always been maintained, cases have arisen in which the courts felt bound to exercise jurisdiction, though the ostensible object of the action was to work results out of their territorial jurisdiction, and though, for that reason, the action seemed to partake somewhat of the characteristics of a local action. Nearly all, if not all, these cases arose in equity. Of course, the action had to be strictly against the person of the defendant, and the court had to acquire jurisdiction of the person by the service of process within its territorial jurisdiction, and the judgment prayed for had to be one which was enforceable against the defendant within such territorial jurisdiction. But where these elements concurred, and the cause of the. controversy was not in its nature necessarily local (as it is in actions of ejectment, trespass quare clausum fregit, waste, the prevention or abatement of a nuisance, &c., &c.), and especially where the defendant in the action was liable to the plaintiff, either in consequence of contract, or as trustee, or as a holder of a legal title ac-' quired by any species of mala fides practiced on the plaintiff, the courts did not hesitate to hold that the principles of equity gave to the court jurisdiction wherever the person might be found, and that the circumstance that a question of title might be involved in the inquiry, and might even constitute the essential point on which the case depends, was not sufficient to arrest jurisdiction (Gardner v. Ogden, 22 N. Y. 327, and cases there cited).
Thus, to cite only a few instances in Gardner v. Ogden, the court of appeals of New York affirmed *389 the judgment of the supreme court compelling a re-conveyance by the defendant of lots in Chicago, Ill.
In the case of Penn v. Baltimore (1 Ves. 444), Lord Hardwicks, of the English court of chancery, decreed specific performance of articles settling the boundaries of the Colonies of Maryland and Pennsylvania, made and executed between the respective proprietors thereof.
In Massie v. Watts (6 Cranch, 148), the supreme court of the United States sustained the decree of the circuit court of Kentucky against the defendant, to compel him to convey to the plaintiff lands in the State of Ohio, to which the defendant had obtained the legal title, but to which the plaintiff claimed to be equitably entitled.
In Muller v. Dows (94 U. S. [4 Otto] 444), the supreme court of the United States even affirmed in full the decree of the circuit court of Iowa, directing a foreclosure of a mortgage on the entire railroad and franchises of the Chicago and Southwestern Railroad Company, and ordering a sale of them, though part of the property ordered to be sold was situate in the State of Missouri, and consequently outside of the territorial jurisdiction of the court.
In the case at bar, the plaintiff, the Atlantic and Pacific Telegraph Company, and the defendant, the American Union Telegraph Company, are each a corporation incorporated under the laws of the State of Hew York, and having its principal place of business in the city of Hew York, and consequently, each of them is not only a resident, but also a citizen of the State of Hew York, and under the provisions of section 364 of the Code of Civil Procedure, each of them is also a resident of the city of New York. The Baltimore and Ohio Railroad Company is a corporation incorporated under the laws of the State of Maryland, and has its principal place of business in the *390 city of Baltimore, in the said State of Maryland, and is to be treated, therefore, as a foreign corporation, though it also has, as has been shown, an office and place of business in the city of New York.
The facts which stand substantially admitted, are : In 1875, the plaintiff, with the knowledge and consent of the Baltimore and Ohio Railroad Company, put np a line of poles on the said defendant’s railroad from Wheeling, in the State of Virginia, to Columbus, in the State of Ohio, and subsequently continued this line from Wheeling to Washington, Pennsylvania, and strung on these poles three wires, which it connected at the Pennsylvania terminus with its other wires, which extended from that place to this city, and from this city to various points in the United States and Canada. Early in 1877, the plaintiff strung a wire on said poles along said railroad from Washington, D. C., to Parkersburg, Virginia, and this was connected with plaintiff’s line from Washington to New York. In 1877, the plaintiff, with the consent of the said defendant, strung a wire on the said poles along said railroad, from Chicago Junction, Ohio, to Chicago, 111., and this wire was also connected with the plaintiff’s other wires just mentioned. In this way the plaintiff’s wires along defendant’s railroads became part of the plaintiff’s general system of telegraph which has its center in this city, and formed a very important and material part thereof.
Beyond the facts stated, as to which there is no controversy, the plaintiff claims that the poles and wires mentioned were erected by the plaintiff under certain agreements between the plaintiff and the railroad company, and the action is brought in equity to restrain the defendants from interfering with the plaintiff’s right under said agreements to use the said *391 poles and wires, and also for an accounting as to certain receipts.
On the hearing below, there was a dispute as to the nature and terms of the agreements upon which the plaintiff relies, and the principal matters in difference between the parties in this respect may be stated as follows:
1. The plaintiff claims that a formal written contract was made and executed by it, and sent to the railroad company, under which the plaintiff had an absolute and .permanent right to continue the lines of poles and wires from Washington, Pennsylvania, to Columbus, Ohio. The railroad does not deny that it received this contract, duly executed by the plaintiff, but it does deny that it ever accepted the same.
2. The plaintiff admits that as to the other lines of telegraph, the railroad company had the right to acquire ownership of them, and to exclude the plaintiff from their use upon giving the plaintiff one year’s notice of its intention so to do, and paying the plaintiff the cost thereof. The said defendant claims that it had the right to take possession of all the lines without giving the plaintiff. any previous notice, and without paying anything to the plaintiff, but subject to an accounting between them as to various matters growing out of their previous business relations.
3. The plaintiff also claims that the agreement provided for a division of the receipts for messages delivered to the plaintiff at its different offices on the said defendant’s roads, in certain varying proportions not material' here to be stated; that most of these receipts the Baltimore and Ohio Railroad Company retained ; and that there should be an accounting as to them.
The object of the action, therefore, was to restrain an alleged unlawful interference by the defendants with certain rights, claimed by the plaintiff under a *392 contract with one of the defendants, and to have an accounting. In this aspect, the action, as brought, is not necessarily, in its entire scope, a local one, within the true and established meaning of that term, and the question of jurisdiction in that respect, may depend as much, if not more, upon the nature and character of the interference complained of, whether threatened or actual,' and upon the place where planned or about to be planned, than upon the locality in which it is to be carried out. In other words, where the complaint as a pleading is in general terms, which are not necessarily inconsistent with jurisdiction, the question of jurisdiction, so far as it relates to the subject-matter, depends upon the proof, and not upon the pleading. Under the former practice, it sometimes happened that a place was, contrary to the real fact, described under a videlicet which brought it within the local j urisdiction. In such a case, a demurrer was not the proper remedy, but the defendant had to take the objection at the trial, when the plaintiff failed to show the locus in quo to be within the territorial jurisdiction.
Now, the plaintiff complained, that in violation of existing agreements, the defendants threatened to deprive it, and were about to deprive it, of the use of certain specified lines of wires ; that the principal part of the benefit and advantage derived by the plaintiff from the agreements aforesaid, and the principal consideration moving to it in and from the same, consisted in the connections which the plaintiff is, by means of said agreements, enabled to make between its other lines of telegraph and the specific line in controversy; that the aggregate business done by the plaintiff in the transmission of -telegraphic messages is largely dependent upon its ability to transmit messages upon said last-mentioned lines in connection with its other lines ; that the interruption of such connections would *393 not only deprive it of the ability to transmit telegrams to many of the cities upon the lines of telegraph upon the railways owned or controlled by the Baltimore and Ohio Railroad Company, but would also injuriously affect its other business, and would give an advantage to other and competing lines of telegraph; that it would be impracticable to keep an account of, or ascertain the precise amount of such injury to plaintiff ; and that for these reasons, unless the defendants were restrained, the plaintiff would not only sustain an irreparable injury, but one that could not be compensated in damages. So far, therefore, the plaintiff shows a cause of action which calls for equitable relief.
Moreover, the origin of all interference apprehended and threatened, according to the proofs submitted on the hearing of the motions, consisted of a combination, entered into and about to be consummated, between the defendants in the city of New York, pursuant to which the plaintiff’s wires upon and along the railroads controlled by the railroad company were to be forcibly taken from the plaintiff and to be turned over to the American Union Telegraph Company, and pursuant to which the orders necessary for the accomplishment of these purposes were to be sent from the city of New York.
That this combination existed, that its objects and purposes were as stated, and that decisive measures to secure such objects and carry out such purposes were about to be taken, was conceded by Charles A. Tinker, the superintendent of the telegraph department of the railroad company. In his affidavit, made on behalf of said company, and sworn to March 4,1880, he testified as follows, viz. :
“The President of the Baltimore and Ohio Railroad Company being in New York, during the last week in February, on business connected with the *394 trunk lines, I went thither on the night of the 26th nltimo, taking with me the contract between the-Baltimore and Ohio Railroad Company and the American Union Telegraph Company, and consequent notice to the Atlantic and Pacific Telegraph Company of the termination of all arrangements with it, both of which awaited his signature. The contract to which I referred was signed by the contracting parties on Saturday, the 28th of February, and the notice to the Atlantic and Pacific Telegraph Company was immediately thereafter signed by the president of the railroad company. I went, as promptly as possible, to the office of the Atlantic and Pacific Telegraph Company, and delivered to M.. Chandler, the president, the notice which had been signed by the president of the railroad company, a copy of which is filed in the cause, 'fhis took place at about fifteen minutes past four o’clock p. m., on the 28th ultimo’’
The affidavit of John W. Garrett, the president of the railroad company, sworn to March 4, 1880, contains a similar admission. In it Mr. Garrett says:
“I was at the time (referring to February, 1880) engaged in negotiations with the American Union Telegraph Company, looking to a co-operation arrangement between the company and the Baltimore and Ohio Railroad Company, which, when made, necessitated a full possession of all the lines of telegraph upon the Baltimore and Ohio Railroad and connections. The formal contract was being prepared, and I anticipated its execution within the month of February, so that the 1st of March was the latest period to which I could extend the time for coming into possession oi these lines. I was in New York on the 26th,‘ 27th, 2'ith and 29th of February, to attend a meeting of the p, esidents of the trunk lines, and to other business there. Mr. Tinker came to New York on the 27th ultimo, bringing with him the contract with the American *395 Union Telegraph Company, and the notice to the Atlantic and Pacific Telegraph Company, which had been prepared at Baltimore for my signature. After executing the former paper, on the 28th ultimo, I signed also the notice to the Atlantic & Pacific Telegraph Company, above referred to, and instructed Mr. Tinker to deliver the same to the president of that company.”
In view of these circumstances the contention of the defendants that a foreign corporation can, through its authorized agents, do such things in the State of New' York, without being subject to our laws or amenable to our courts, and that, even if the commission of such acts involves a gross violation of contract obligations against our citizens, redress can only be obtained by going to the jurisdiction in and under which it was and is incorporated, cannot be sustained.
True, a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created, and it must live and have its being in that State only.
It is by the law of comity among nations, that a corporation created by one sovereignty is permitted to make contracts in another, and the same law of comity prevails among the several States of the Union.
But while a corporation does business in a State other than the one by which it was created, it is subject in all respects to the laws of such State; for its franchise is a special privilege conferred upon it by the State that created it, and not one which belongs to the citizens of this country generally, of common right.
Thus, in Lafayette Ins. Co. v. French (18 How. U. S. 404), where a corporation chartered by the State of Indiana was allowed by the law of Ohio to transact business in the latter State, upon condition that service of process upon the agent of the corporation should be considered as service upon the corporation *396 itself, it was held that a judgment against the corporation, obtained by means of such process, ought to have been received in Indiana with the same faith and credit that it was entitled to in Ohio that the State of Ohio had a right to impose such a condition ; and that when the company sent its agent into that State, it must be presumed to have assented to the rule.
Upon the same reasoning the jurisdiction of the supreme court of the District of Columbia was sustained in Baltimore & Ohio R. R. Co. v. Harris (12 Wall. 65), over an action to recover damages for personal injuries sustained in consequence of a collision which occurred in the State of Virginia.
In this connection it should also be noticed that the Baltimore and Ohio Railroad Company, though it disclaims that it has a railroad belonging to it or under its control in this State, was shown to do a regular business and to have property here. It has offices in this city, with signs displayed thereon, for the sale of passenger tickets, and for making contracts to carry freight. It occupies a pier in this city, with its name conspicuously displayed thereon, for handling freight. It makes contracts here for the carriage of passengers and freight from this city to Baltimore and Chicago, and other points in the West. It also' runs through cars between Baltimore and Boston. In doing so, the cars are placed on board of a boat at Jersey City, passed through the harbor of New York and the East River, and landed on a pier on the north shore of the Harlem River, where they are transferred to a connecting railroad. The trunk lines referred to in the affidavits of Tinker and Garrett, on the business of which the latter had come to New York, were shown to be the lines of transportation from the city of New York to the West, of which the Baltimore and Ohio Railroad is one. . These facts establish affirmatively that the' said company has property within the State against *397 which, the judgment and orders of the court can be enforced.
It was not contended by the defendants, either at special term or upon the argument of the appeals, that there was any reason why this action, if maintainable at all in this ' State, might not be maintained in this court, as well as in the supreme court. It is hardly necessary, therefore, to refer upon this point to the case of People v. Green (58 N. Y. 303), in which it was held that the statute extending the jurisdiction of this court to any cause of action is constitutional, provided service of process is made within the limits of the city of New York.
In view of the principles settled in the cases herein-before referred to, I am satisfied, upon the point so far considered, that in so far as the object of the action is to restrain the defendants from taking possession of the plaintiff’s wires and poles, which, if not real estate, are fixtures, for the purposes of this controversy, the action is a local one, within the true and established meaning of that term, and that no court of this State has jurisdiction to grant, by judgment or order, such injunctive relief, because no part of the property is within the territorial jurisdiction of the State. For the same reasons, no court of this State can, in view of the allegations of the supplemental complaint, to the effect that the defendants did take possession, decree, by judgment or order, a restoration of the possession to the plaintiff. No court has yet gone to the extent of immediately acting upon the actual possession of property which is beyond its territorial jurisdiction and the reach of its final process. This point has been fully discussed by Judge Sedgwick, and I cordially .concur in his views upon it. But the question of jurisdiction in this case, as it stands at present, is not wholly disposed of by the fact that the complaint or supplemental complaint, or both together, asked too *398 much, and that the injunction orders, as granted, were too broad. As to the accounting prayed for, the action is well brought and within the undoubted jurisdiction of the court. So, under the prayer for an injunction against all interference, direct and indirect, with plaintiff’s rights under its contract with the railroad company, and for such other and further relief as may be proper, the court, upon the proofs before it, has the power to grant relief against the operations carried on by the defendants to plaintiff’s prejudice in the city of Mew York, for it appears that the consummation of the scheme between the railroad company and Ameri.can Union Telegraph Company was imminent at the time of the commencement of the action, and did take place in the city of Mew York, subsequent to the service of process upon the president of the railroad company, and that, in pursuance of such consummation, the orders necessary for the accomplishment of the purposes of the defendants were sent from the city of Mew York. Sack a limitation of the scope of the action may, or may not, necessitate an amendment of the pleadings, but it does not affect the question of jurisdiction. As long as jurisdiction attached for any purpose, the plaintiff should not have been wholly turned out of court, but the defendants should have been left to plead by answer the alleged want of jurisdiction as to the remaining matters.
My conclusion therefore is, that the court below, provided it acquired jurisdiction of the person, had jurisdiction of the subject-matter of the action to a sufficient extent to grant to the plaintiff some sort of injunctive relief, and that consequently there was jurisdiction to grant a preliminary injunction. The question whether, after argument, the injunction as granted should have been retained, modified or vacated, will be considered hereafter.
Having reached the conclusion stated, it becomes *399 material to determine, as the next question, whether jurisdiction of the person was acquired.

As to the jurisdiction of the person.

That the person proceeded against must be within the jurisdiction of the court entertaining the cause of action, seems to be as well settled as a general principle of international law, as the principle that in a proceeding in rem the court must have jurisdiction of the thing proceeded against. But nearly all governments have found it necessary to authorize their courts, in the administration of justice, to entertain jurisdiction to some extent over non-residents and absentees from their territory. A due regard for the welfare of their own citizens, whose rights of property or person, it is agreed, should not be impaired by the absence of persons who may be interested with, or related to them, is offered as a justification for the practice.
Process at the common law had to be served upon the person of the defendant. If he failed to appear in court, in obedience to the verbal warning of the sheriff holding the original writ, writs of attachment issued from the court, commanding the sheriff to attach him by taking certain of his goods, which should be forfeited if he did not appear. If after this he neglected to appear, writs of distress issued from time to time, till he was stripped of his goods and profits of his lands, which all became forfeited to the king. Here the process ended in cases of injuries without force, until the enactment of statutes, which allowed a capias for his person in actions of account, detinue, and case, in like manner as it had before been used in actions for injuries accompanied with force. If he could not be found upon the return of this writ, the suit was at an end (3 Blacks. Comm. 283, 284). The proceedings of outlawry which followed at the option of the plaintiff, resulted in a general forfeiture of his property to the king, from whom the plaintiff, on peti *400 tion to the court of exchequer or lords of the treasury, could obtain the satisfaction of his demand. But he was left without judgment upon his claim and the satisfaction of it was limited by the value of the property found.
Nearly the same strictness prevailed in the court of chancery until the enactment of modern statutes. It was a rule in equity that all persons legally or beneficially interested in the subject-matter of a suit, should be made parties, and if such a person was absent, it was usual to state his name and pray process against him when he came within the jurisdiction. In the reign of George II. the court of chancery was authorized to commence and proceed to final judgment against a subject of the kingdom, who had withdrawn or absconded from his usual place of abode, for the purpose of evading process (5 Geo. II. c. 25). Notice of the suit had to be inserted in the London Gazette, and posted in some public place at the Boyal Exchange. This statute was repealed by 11 Geo. IV. and 1 Will. IV. c. 36, in which, however, the provisions relating to process by constructive notice were re-enacted (11 Geo. IV. and 1 Will. IV. c. 36). These statutes have probably been the basis of the laws authorizing service of process by publication in different States of the United States.
In Tennessee (Code of Tenn. [1858], p. 779), Mississippi (Rev. Code [1857], p. 545), North Carolina (Rev. Code [1854], p. 188), Yermont (Comp. Laws [1850], p. 210), Illinois (1 Ill. Stat. [1863], p. 139), Arkansas (Ark. Dig. of Stat. [1846], p. 227), and Colorado (Laws of Colorado [1861-1862], p. 183), suits in chancery maybe maintained against non-residents upon constructive service of process by publication.
Actions at law may be brought in certain cases upon like service of process in Minnesota (Stat. [1851], p. 335), Kansas (Comp. Laws [1862], p. 163), Ne *401 braska (Laws Nebraska [1857-1859], p. 119), Iowa (Rev. Laws [1860], p. 501), Ohio (2 Rev. Stat. [1860], p. 964), Wisconsin [Rev. Stat. [1858], p. 719), and New York (Code of 1848 and acts amendatory thereof).
In Indiana (2 Stat. Ind. [1860], p. 64), California (Comp. Laws [1850-1853], p. 524, § 30), Kentucky (Stanton Code Pro. p. 52, § 88) and Maine (Rev. Stat. [1857], p. 499, § 24), actions at law may be maintained against non-residents upon constructive service of process by publication or such mode as the court may order.
Of course none of the statutes referred to can go further than to confer, upon the service thus made, jurisdiction over the person of the defendant, for the purposes of the action commenced, so as to enable the court to pronounce a judgment which shall be valid and enforceable within the territorial limits to which the court is confined. But within those limits it cannot be contended that any of these statutes is in violation of the Constitution of the United States, and no court would be justified in declaring any of them void as opposed to natural justice, or the principles of international law. Considerations of this sort belong exclusively to the legislative department, and afford no aid to the courts in opposing the ascertained will of the State. If, therefore, it is the will of the lawmaking power of a State that all manner of judgments shall be rendered against non-residents and absentees upon constructive service of process, such as publication, there would seem to be no power in the courts of that State to refuse obedience. These principles are fully sustained by the decision of the court of appeals in Gibbs v. Queen Ins. Co. (63 N. Y. 114). It is only when the judgment records come before foreign tribunals of a different sovereignty, and the latter are asked to enforce the judgments, that the questions. *402 arise which were discussed and passed upon in Pennoyer Neff (95 U. S. [5 Otto] 714).
The court, therefore, could acquire jurisdiction over the person of the Baltimore & Ohio Railroad Company for the purposes of the action by any service of ¡process authorized by the laws of the State, and the next question is whether a service of the summons and ¡complaint upon the president of that corporation was ;sufficient for the purpose.
This involves a review of the legislation of the State authorizing the commencement and prosecution of actions against foreign corporations, and prescribing the mode of service of process upon them. In order not to extend the discussion to an unnecessary length,
I shall not refer to actions against non-residents in. general. Such review was extensively made in 1875 by Folger, J., delivering the opinion of the court of appeals in Gibbs v. Queen Ins. Co. (63 N. Y. 114), and the following propositions extracted from said opinion will suffice for the present occasion, viz. :
Before the Revised Statutes a foreign corporation could not be sued at law in invitum, in our courts (McQueen v. Middletown Manuf’g. Co., 16 Johns. 5). Upon the report of the revisers that the fair protection ■of our own citizens required that some provisions should be made to render such corporations amenable to our laws in our courts, certain sections were adopted. They were drawn in analogy with the provisions of the statute against absent debtors, and required'that suits in the supreme court against a foreign corporation should be commenced by attachment .(2 R. S. p. 459, §§ 15-30).
By chapter 107 of the Laws of 1849 (p. 142), it was provided that suits against any foreign corporation might .be brought in the supreme court, in the superior court and court of common pleas, upon any cause of action arising in this State, by complaint and summons, with *403 an attachment as then provided by law ; the summons and complaint to be served as provided by sections 113 and 114 of the Code of Procedure of 1848.
But when later in the year 1849 the legislature, in enacting amendments to the Code, again took up the subject of the enforcement of rights against foreign corporations, it authorized by section 427 of chapter 438 an action against a corporation created by the law of any other country to be brought in the same courts named in chapter 107, above cited :
1. By a resident of this State, for any cause of action.
2. By a plaintiff not a resident of this State, when the cause of action shall have arisen, or the subject of the action shall be situated, within this State.
This was in some respects absolutely inconsistent with chapter 107 of 1849, and so far repealed it by implication. The legislature, in authorizing an action by this section, meant the one form of action for the enforcement of private rights, which it at the same time provided" for and denominated a civil action (Code, § 69), and inasmuch as, by section 127, that action could be commenced alone by service of a summons, and the form of that summons (§§ 128, 129) and the mode of that service, were prescribed (§§ 113, 114 of 1848), it at the same time, with the authority for bringing the action by that summons, gave, for the first time, the power to serve it on a foreign corporation, either by the delivery of a copy to a certain officer of it or by publication (§§ 134, 135 of 1849). It also, in that year, for the first time, provided for an attachment, under the Code, upon property of a foreign corporation, as a security for the satisfaction of the judgment.
The claim advanced in that case, which is also made in the case at bar, that the service of the summons must nevertheless be accompanied by the levy of *404 an attachment upon the property of the corporation, Judge Folger disposes of as follows :
“ The one hundred and thirty-fourth section, as adopted in 1849, makes no limit of that kind upon the service by publication, though it was required by the corresponding section of 1848 that the absent defendant should have property in this State, or should be a resident thereof. It is not needed that stress be laid upon this difference. In 1851 sections 134 and 335 were amended, and the mode of service of summons upon a foreign corporation was brought distinctly into notice. It was declared that there might be service by delivery of a copy to any one of certain officers of it, but only when it had property in the State, or the cause of the action arose therein (§ 134); and that there might be service by publication only in one of the same cases (§ 135). These sections have since been amended, but with no narrower limitation. By putting these alternative cases, it is shown that the legislature did not mean to insist on the existence of property of the foreign corporation in this State, as always a necessary prerequisite for such a service of summons upon it, as should be the commencement of an action against it. The language- of these sections is to this effect. Before you begin your action against a foreign corporation by the service of a summons upon it, by delivery of a copy or by publication, either there must be property of it in this State, or the cause of action must have arisen therein ; one or the other, and, either will suffice. If the legislature did not intend to make the existence of property in this State a controlling element in the right to commence an action, then it did not mean to make an attachment against property a process necessary thereto, for the plain reason that it would be futile to issue an attachment to be levied upon property when none could be found ; and delusive to'allow the service of summons in a case where no *405 property can be found in the State, if still there must be, for the effectual bringing of an action, an attachment issued and levied upon property here.”
It now remain's to be seen whether the Code of Civil Procedure, that went into effect since the decision of the case last referred to, has worked any change in the law as it was declared at that time.
On examination it will be found that the great feature of the prior Code, which provided for a single form of action for the enforcement of all private rights, denominated a civil action, and for the commencement thereof by the service of a summons, rendering any other conjoint process unnecessary, was carefully preserved.
It will also be found that section 427 of chapter 438 of the statute of 1849 was retained in its original language, and that section • 263 of the Code of Civil Procedure, the object of which was to render the civil jurisdiction of all the superior city courts uniform, confers additional powers upon the courts named therein. That section, so far as it relates to foreign corporations, is as follows:
“ § 263. The civil jurisdiction of each of the superior city courts extends to the following actions and special proceedings, in addition to the jurisdiction, power, and authority, conferred upon it in a particular case, by special statutory provisions (subd. 7): To an action brought by a resident of that city against a foreign corporation, either, 1, to recover damages for the breach of contract, express or implied, or a sum payable by the terms of a contract, express or implied, where the contract was made, executed, or delivered within the State, or where the cause of action arose within the State; or, 2, where a warrant of attachment, granted in the action, has been actually levied, within that city, upon property of the corporation; or, 3, where the summons is served by delivery of a *406 copy thereof, within that city, to an officer of the corporation, as prescribed- by law.”
In the first two classes of cases, therefore, enumerated in subdivision 7 of section 263, it would seem that the superior city courts have power to order service of the summons by publication. But whenever the summons is served, as prescribed by law, by a delivery of a copy within the territorial jurisdiction, the jurisdiction of the courts named embraces any cause of action cognizable by the courts of the State.
The next question therefore, is, what are the requirements of the law as to personal service of the summons upon a foreign corporation ?
Section 432 of the Code of Civil Procedure prescribes: Personal service of the • summons, upon a defendant, being a foreign corporation, must be made by delivering a copy thereof within the State, as follows:
1. To the president, treasurer or secretary; or, if the corporation lacks either of these officers,' to the officer performing corresponding functions, under another name.
2. To a person designated for the purpose by a writing under the seal of the corporation, and the signature of its president, vice-president, or other acting head, accompanied by the written consent of the person designated, and filed in the office of the Secretary of State, &c., &c., &c.
3. If such a designation is not in force, or if neither the person designated, nor an officer specified in subdivision one of this section, can be found with due diligence, and the corporation has property within the State, or the cause of action arose therein; to the cashier, a director, or a managing agent of the corporation, within the State.
By this section the absolute duty of designating a person for the purpose of receiving process, as a condition upon which they may do business here, which *407 is specifically required of foreign fire insurance companies by other statutory provisions (L. 1853, p. 915, § 23 ; L. 1862, c. 367), has not been extended to foreign corporations in general. But the legislative intention in enacting it, clearly was that if a foreign corporation doing business here has not sufficient regard for its own interests to make a designation, service of process upon one of the persons enumerated in subdivisions 1 and 3, and as therein prescribed, shall in every case be sufficient. This becomes still more clear when it is considered that the section referred to is a substitute for and superseded subdivision 1 of section 134 of the prior Code, and chapter 279 of the Laws of 1855, and that the last mentioned statute provided that every foreign corporation doing business in this State should designate some person for the receipt of service of process, and that in default thereof service on any person found within this State acting as the agent of such corporation, or doing business for it, should be effectual.
Service, therefore, of the summons in this action, upon the president of the Baltimore and Ohio Railroad Company, within the limits of the city of New York, was sufficient to confer jurisdiction upon this court of the person of said corporation, for the purposes of the action. If the service which was made in fact, was regular, it having already been shown that the court also possessed jurisdiction of the subject-matter to some extent at least, the orders appealed from cannot be sustained.
It is claimed, however, that the alleged service was invalid, because access to Mr. Garrett was obtained by fraud, trick and device. This court has repeatedly held that where deceit is used for the purpose of bringing a defendant within its territorial jurisdiction, who otherwise would not be amenable thereto, the service of the summons effected by such means will be vacated *408 and set aside on motion (Carpenter v. Spooner, 2 Sandf. 717; Baker v. Wales, 3 Jones & S. 403).
But the rule goes no further. According to his own showing Mr. Garrett was in New York on the 26th, 27th, 28th and 29th of February,. to attend a meeting of the presidents of the trunk lines and to other business there. His complaint simply is that when the parties having the papers for service first arrived, on the 28th of February, at the hotel at which he was stopping, they endeavored to gain access to him by stating that they wanted to see him on the business of the New York Elevated Railroad Company. But the fact is that they did not obtain access to him at that time, and that he was, later in the day, served in the public hall of the hotel. Moreover, the parties thus sought to be charged with improper conduct expressly denied the charge. Upon a full consideration of all the testimony read upon this point on both sides, no sufficient reason appears for setting aside the service of the summons.
The question of jurisdiction having been disposed of, it remains to be determined what should have been done below upon the hearing of the motions, and here again it is necessary to notice several technical objections before the merits are reached.
As to the injunction order, it was claimed that the alleged service of it upon Mr. Garrett was not valid, because the order purports to be a special term order, and no certified copy thereof was delivered. True, the order contained a caption which is not only usual, but necessary, in the case of a special term order. But that did not necessarily make it one. It was signed by the judge with his full name, and no direction was given to enter it, nor was it in point of fact entered. It therefore remained the judge’s order.
The next claim is that if the order were to be regarded as the. judge’s order, it was not duly served,
*409 because the signature of the judge was not shown as required by the Code. Section 610 requires that where the injunction order is granted by a judge, it must be served by showing the original and delivering a copy thereof. The service was made by one Henry C. Freeman, who is thirty-three years of age, and perfectly familiar with serving process. He testifies positively that when he gave the envelope which contained the papers into the hands of Mr. Garrett, he informed him that the contents consisted of the summons and complaint and injunction in a suit against the Baltimore and Ohio Railroad Company; that Mr. Garrett took the papers; that then he (Freeman) opened the original injunction order, showed Garrett the judge’s signature at the foot thereof, and said to him : This is the signature of Chief Justice Curtis to the original injunction order, of which you have a copy inside that Garrett took the papers out of the envelope, looked at them, and went with them in his hand through the hall towards his room. In this statement Freeman stands fully corroborated by Mr. Yose, a student-at-law in the office of plaintiff’s attorneys, and as Mr. Garrett admits that a paper, partly written and partly printed, was shown to him, and that reference was made to Judge Curtis, and that thereupon he went directly to his room, and then took the papers from the envelope and read them, the clear weight of evidence, supported by the probabilities, is that the judge’s signature to the original order was shown.
It is also insisted that the injunction order itself is defective and void, because it does not recite the grounds of the injunction. True, section 610 of the Code of Civil Procedure prescribes that the injunction order should briefly state the grounds for the injunction. But a failure to comply with this requirement is not a jurisdictional defect. It constitutes only an irregularity for which the injunction order may be set *410 aside, and if no substantial right of the defendant has 1 been violated, the defect may be disregarded or supplied under section 723. No prejudice is shown to have accrued in this case, nor is the order, as drawn, wholly defective in the particular referred to. It states that it was made on the verified complaint and affidavit of A. B. Chandler, copies of which were served with it. These contain the grounds on which the judge acted, and the order refers the defendants to them as therein stated. In some cases,—as, for instance, where the complaint is not served with the order, or where the grounds of the injunction are matters extrinsic to the cause of the action set forth in the complaint,—the requirement of the Code may be of value. But in the case at bar, where the grounds of injunction are fully contained in the complaint and affidavit accompanying it, and the order in terms refers to such papers, and where copies of such papers were served with a copy of the o'rder, and no prejudice whatever is shown to have accrued from the plaintiff’s omission to comply literally with the, requirement of section 610, .the right and justice of the case require that the objection founded upon this defect, if it be one, should not be entertained on appeal in the first instance. The same considerations would dispose of the remaining objection that the preliminary injunction, as granted, does not strictly follow the prayer for an injunction contained in the complaint, even if there were a requirement that this should be so, which is not the case.
As to the merits of the controversy.
As already stated there was, on the hearing below, quite a dispute as to the nature and terms of* the agreement upon which the plaintiff relies. ' Upon the whole case I have not been able to satisfy myself that such a contract existed between the parties as is alleged in the complaint. The plaintiff failed to prove an acceptance of the formal written contract relating to the line *411 from Washington, Pa., to Columbus, Ohio, which was made and executed by it, and sent to the Baltimore and Ohio Railroad Company for execution, while the latter showed expressly its refusal of it. Consequently, whatever arrangement may have existed in respect to that line must be deemed to have been substantially the same as it existed between the parties as to the other lines. The plaintiff also failed to show, by a preponderance of proof,(that, as to all other lines, it was entitled to one year’s notice of the intention of the Baltimore and Ohio Railroad Company to acquire the absolute ownership and control of them, to the exclusion of the plaintiff from their use. But the clear weight of the evidence is that the railroad could only acquire such absolute ownership and exclusive control upon payment to the plaintiff of the cost of the lines. In this respect the claim of the plaintiff stands corroborated by the affidavits of Eckert and Tinker, read on behalf of the defendants, while Mr. Garrett is the only one who testifies to the contrary. This state of the proof, even when considered wholly apart from the improbability and unreasonableness of the claim made, that the railroad company had the right to acquire the absolute ownership and exclusive control, if it saw fit, of the lines, the day after they were built, and the amount of compensation was to be left an open question, becomes still more important when it is borne in mind that it is agreed, on all sides, that the arrangement between the two companies, whatever it was, was made between General Eckert, who was formerly president of the plaintiff’s corporation, and now is the president of the American Union Telegraph Company, as the representative of the plaintiff, on the one hand, and Mr. Garrett, as the representative of the Baltimore and Ohio Railroad Company, on the other hand.
The same questions seem to have been litigated by the parties to this action on a motion made by the *412 plaintiff before Judge Tuley of the circuit court of Cook county, in the State of Illinois, for an injunction similar to the one prayed for here, upon proof corresponding very much to the proof here.
Judge Tuley held : That the arrangement between the plaintiff and the railroad company was in the nature of a partnership or joint adventure. The property of each was used to make money for both, and was used as joint property, for the common benefit. By the joint arrangement the property of the parties became to some extent so intermingled that it was necessary on its termination that the railroad company should own all the property, and for the railroad company’ s' own security it was necessary that this power to terminate the joint arrangement and take possession should exist. But a court of equity will scan, as with an eagle’s eye, the circumstances attending the exercise of that legal right, to discover, if possible, whether the right has been exercised in good faith, or whether the virus of malaftdes has destroyed the vitality of the act. In the course of his examination into such attending circumstances which he then made, Judge Tuley says : “In the first plafce, the primary object of this power being reserved to the railroad .company, was for its own protection. It was not to enable the railroad company to obtain any unfair advantage over the telegraph company, and obtain its property at an under value, or to enable it to wantonly or oppressively injure or destroy the telegraph company ; nor to enable the railroad company to speculate upon the property it might acquire by terminating the agreement, but it was solely to be used for its, the railroad company’s, own protection and benefit. Ho cause of complaint appears to exist against the telegraph company; it does not appear that it has not carried out its contract in good faith, nor does it appear that it was necessary for the protection of the railroad company that the *413 agreement should be terminated. The same day it was terminated, an arrangement was made by the Baltimore and Ohio Railroad Company with a rival telegraph company. Was it good faith to terminate the agreement to benefit a rival in business of the telegraph company ? Was it a bona fide exercise "of this power to terminate this agreement for the joint benefit of the railroad company and the American Union Telegraph Company % Tried by the standard of morality that pervails in this court, both these questions must be answered in the negative. Would the exercise of this right, in order that the railroad company might have an advantage in the settlement of accounts, be an exercise of the power in good faith % Most clearly not. The defendant railroad does not by its answer state that it offered to pay for the property, or that it is now willing to pay for the same. The only offer it made on taking possession, or now makes, is to adjust accounts. Does good faith resort to deceit and fraud to enable it to exercise a clear, legal right, as by giving notice, on February 28, that possession would be taken March 1, and then taking possession clandestinely within five hours after the notice is given ? This may be justifiable by a standard of good faith that exists elsewhere, but cannot be justified by the standard that exists in a court of conscience.”
Having reached this conclusion, and having previously found, that, as a matter of fact, payment was to be made upon taking possession, and that it was to be a payment of the original cost, and not a balancing or settlement of accounts, the learned judge granted the motion for an injunction.
In the case at bar I can reach no different result. Independent of the question whether the plaintiff under all the circumstances is, or is not, entitled to at least a reasonable notice, and assuming that all the lipes in controversy were erected by the plaintiff upon, and *414 affixed to, real estate "belonging to the railroad company, under a mere license, revocable at the pleasure of the railroad company, which is the aspect most favorable to the latter, though not strictly true in fact, such license was given pursuant to an agreement that its revocation should be accompanied by payment, and that in the meantime the plaintiff should have the full, free and uninterrupted use of the lines. The giving of the license constituted only part of the agreement. The lines were erected on the faith of the whole of it, and are protected by it. The right of the railroad company to acquire the absolute ownership and exclusive control depends not merely upon a revocation of the license, but on the performance' of a condition which, by the terms of the agreement, is to be performed on its part in connection with, and at the time of the revocation. That condition is payment, or tender of payment at least, and it is a condition precedent.
The agreement clearly had, as was truly said by the learned counsel for the plaintiff, two parts, that were reciprocal and dependent the one on the other. So that if there was agreement enough to support the claim of the defendants, that by means of it they are entitled to become owners of the plaintiff’s property, it is sufficient also to entitle the plaintiff to protection against the consummation of an illegal scheme to obtain possession without making compensation. The issues upon which the railroad company’s claim of title must turn depend upon the details of the arrangement, which can only be derived from the examination and cross-examination of all parties personally concerned in the business. Upon their present affidavits the strong preponderance-of proof is that the joint arrangement was only to be terminated "on making compensation. This, in connection with the other proof in the case, showing the importance to the plaintiff of the lines in controversy, as connecting links in its entire system of *415 telegraphic communication over the whole country, and the irreparable injury the plaintiff would sustain, if the company were permitted to take possession and exclusive control without making compensation at the same time, is amply sufficient to warrant a court of equity to restrain by injunction a threatened violent usurpation of its decision.
Upon this point Judge McCrary of the United States circuit court for the district of Nebraska, in the case of Atlantic & Pacific Telegraph Co. v. Union Pacific Railway Co. and the American Union Telegraph Co., heard at St. Louis, Mo., April, 1880, makes the following pertinent remarks:
“ The right of rescission does not justify the railroad company in taking possession, except by lawful means. The plaintiff has a right to be heard upon issue in a proper proceeding before being ejected. The present question is not, whether the contracts should, in such a proceeding, be rescinded and the property restored to the railroad company, but whether this should be done by the railroad company upon its own motion, and in a way deprive the plaintiff, not only of a hearing in a regular course in this court, but alsó deprive it of the right to appeal. It is one thing for me to hold that the contracts are, in my judgment, ultra vires, and quite another to say to the railroad company : ‘ You may turn the plaintiff out and take possession without giving it a day in court.’ An injunction will often be granted to restrain a party deciding for himself a question involving controverted rights, and to compel him to resort to the courts, and this without regard to the absolute merits of the controversy ; it is enough that there is a controversy to justify a court of equity in directing that it be settled by legal proceedings (Eckelkamp v. Schroeder, 45 Mo. 505; Varick v. New York, 4 Johns. Ch. 53 ; Dudley v. Trustees, 12 B. Monroe, 610 ; Farmers v. Reno, 53 Pa. *416 St. 224; Lansing v. Steamboat Co., 7 Johns. Ch. 162). The principle settled by these and many other cases is, that a party who is in actual possession of property, claiming under color of title, is not to be ousted, except by the means provided by law, and such a possession a court will protect by injunction from disturbance by any other means. For this reason, therefore, as well as upon the grounds above stated, I am clearly of the opinion that the railway company cannot be permitted to oust the plaintiff from possession without process.”
But though the plaintiff thus presents large equities calling for protection, this court, owing to the local character of part of the cause of action, as already stated when the point as to the jurisdiction was considered, can interpose only to a limited extent. It cannot act directly upon the actual possession of the property in dispute which is not within this State. The most it can do, is to protect the plaintiff against unlawful interference set or to be set on foot within this State, and to the extent as the proofs disclosed any such interference, actual or threatened, the preliminary injunction might have been retained, if the plaintiff had asked for it.
For the foregoing reasons the motion of the railroad company to set aside the summons, complaint, and injunction, and the service thereof, and the motion of the American Union Telegraph Company to set aside the supplemental summons, complaint and injunction, and the service thereof, and also the order bringing in said company as a party defendant, should, each of them, have been denied.
On the motion of the plaintiff for the continuance of the injunction, an order might properly have been granted, in effect enjoining and restraining the defendants, and each of them, their officers, attorneys, agents and servants, during the pendency of the action, from taking any steps within the State of New York towards *417 completing or consummating the contract alleged to have been entered into between the defendants, with a view to deprive the plaintiff of the use or control of the wires, poles and property described in the complaint, or from giving or transmitting within or from the State of New York any orders in respect thereto, or from in any other way interfering, or continuing to interfere, within the State of New York, with the plaintiff’s rights in said wires, poles and property.
But as the plaintiff made no request for an injunction in such modified form, and as the injunction, as originally granted, was, for the reasons hereinbefore stated, too broad to be continued, the motion for its continuance, instead of being dismissed, might well have been denied, without prejudice to an application for such injunctive relief as the court had power to grant in the premises. And this is as far as it is expedient to go on the present appeal.
An inquiry should also have been instituted as to the contempt alleged to have been committed by the railroad company and J. W. Garrett. The preliminary injunction having been made with jurisdiction, the defendants were bound to respect it, whether there was an irregularity about it or not, or whether it was too broad or not. As was said in People v. Compton (1 Duer, 512), he who resists the order or process of a court of justice, trusting to his-own belief of its want of jurisdiction, acts, in all cases, at his own peril, and, when he is proved to be mistaken, is, in all cases, justly punished. It is upon this principle alone that the supremacy of the law, and the just authority of courts of justice, can be maintained.
So it has been expressly decided by the court of appeals in the recent case of Mayor, &c. v. New York and Staten Island Ferry Company, that a corporation can be restrained by injunction ; that it can be fined and its property sequestrated for a violation thereof ; *418 that an injunction must not be defeated by subterfuges ,and tricks, and that all persons bound to obey it may be guilty of a violation as well by aiding, abetting or countenancing others in violating it, as by doing it directly.
In the case at bar the plaintiff claimed that after the issuing of the preliminary injunction, and before its actual service, but with knowledge of its existence and the intent to defeat it, John W. Garrett, as president of the railroad company, and others, acting under orders from him, committed certain acts in the city of Hew York, and that during the same interval, and also during the period intervening between the service of the injunction and the hearing of the motions, certain occurrences took place elsewhere, in pursuance of orders sent from Hew York, in consequence of which the plaintiff was deprived of the use of certain lines of telegraph, which the injunction was designed to protect. Without going into details I will simply state that enough was shown to make it the duty of the court to take cognizance of the charge and to make inquiry. If for that purpose it was necessary, in order to acquire jurisdiction over the person of John W. Garrett, to bring him in on an attachment against his person, as was claimed by the plaintiff, such attachment should have been granted. So, if the proof adduced in support of the charges made was not sufficiently explicit, the motion to punish might have been .allowed to stand over for further and more detailed proof, or a reference might have been ordered to take proof, and ascertain the precise facts. As this branch •of the case received no consideration below, -owing to the grounds upon which all the motions were disposed •of, and should not be determined until the court is in possession of all the facts that bear upon it, and especially as the proof at present before the court is not so .full and explicit as it evidently can be made, it seems *419 to me that the general term, should not proceed to finally adjudicate upon it. I am of the opinion that the best disposition to be made of it upon the present appeals, is to order that an attachment issue against John W. Garrett, bailable in a sum sufficient to secure his attendance hereafter ; that interrogatories be filed and served touching the alleged contempts ; that the railroad company and John W. Garrett be required to make written answers thereto, and that it be referred to a referee to examine the said John W. Garrett on oath, upon the said interrogatories, to take such further proofs as either party may produce before him touching the alleged contempts, and to ascertain what injury, if any, the plaintiff sustained in consequence thereof, and the extent thereof, and that he report such answers and proofs to this court, with his opinion thereon, and that upon the coming of in of said report either party may, on eight days’ notice, move at special term for the proper order and adjudication thereon, and that for these purposes the case be remitted to the special term.
The orders appealed from should be reversed, with costs, and orders entered determining the several motions in conformity with the views above expressed. The orders so to be entered should be settled on notice, and on such settlement further suggestions of counsel as to details will receive due attention.
Sedgwick, Ch. J.
I am of opinion that under section 432, Code of Civil Procedure, personal service was made upon the Baltimore and Ohio Railroad Company, defendant, by the delivery of the copy of the summons to the president of the company. The only doubt on the subject is raised by the suggestion, that the gentleman to whom the copy was delivered was not within this State as president, or then acting as such for the company. His own affidavit, however, shows, that besides his being in this State on *420 February 28, when service was made, and on the 27th and 26 th, “to attend a meeting of the presidents of the trunk lines, and to other business there,” he was on the 28th representing the company and- acting for it, in the specific matter involved in this action. In his affidavit, he says that on that day, he, on behalf of his company, signed a notice to plaintiff, that named a time for terminating the arrangement between us and taking possession of the lines, and instructed Mr. Tinker to deliver the same to the president of the plaintiff; and on the same day, after the service, he saw Mr. Tinker and asked him what he had done in the matter of the Atlantic and Pacific Telegraph Company’s lines, and received particular information. The control of the matter had been given to him by his company. His affidavit identifies him with the company. It contains averments of this kind : I could not tell at what time changed relations, &c., might require “ me to have full and prompt possession of all the lines on the Baltimore and Ohio Railroad Company and its connections; it was distinctly agreed that “I was to be at liberty any time I pleased to revoke the license I was giving,” and “at the same time to take possession, if I so pleased, of all wires and poles ; for some time previous to February 28 I had contemplated and determined to terminate, absolutely, all relations with the telegraph company, and to exercise my right to take possession of such wires and poles as it had erected ; I instructed my superintendent of telegraph, (Mr. Charles A. Tinker) about the 12th of February last, to go to How York and personally to notify the president of the telegraph company of my intention.” The proof, therefore,, was, that he was within this State, acting as president, at the time the service was made. Under this view the service being good, if nothing else called for an examination of the nature and validity of the claim stated in the complaint, any *421 objection to the jurisdiction of the court, must be made in the regular way, by pleading.
The motion to continue the injunctions was met by an objection which involves an examination, to a certain extent, of the claim made by the complaint. The injunction orders did not require a broader examination than was necessary to determine whether the complaint stated any cause of action, which supported the injunctions.
The first injunction order was made upon an original complaint against the Baltimore and Ohio Bail-road Company only. The injunction was “from directly or indirectly interfering with or taking possession of any lines of telegraph or telegraphic wires now belonging to or operated by the plaintiff, or from interfering with or preventing the workmen of the plaintiff from repairing or maintaining the same, or any of them, or from cutting or disturbing any of the said wires, whether on the lines of railway belonging to the defendant or operated or managed by it, or in connection with its own lines.”
A temporary injunction may be granted where it appears from the complaint that the plaintiff demands and is entitled to judgment against the defendant, restraining the commission or continuance of an act, the commission or continuance of which, during the pendency of the action, would produce injury to the plaintiff (Code Civ. Pro. § 603). Under this section the question was, did the complaint show that the plaintiff was entitled to judgment, that defendant be enjoined from interfering with or taking possession of the specified wires, or from cutting or disturbing them, or from preventing the workmen of plaintiff from repairing or maintaining them. Under section 604, a temporary injunction may be granted where it appears by affidavit that the defendant, during the pendency of the action, threatens or is about to do, &c., an act *422 in violation of ¡plaintiff’s rights respecting the subject of the action and tending to render the judgment ineffectual.
After the injunction order referred to was obtained, the American Union Telegraph Company was by leave of court made defendant, and a supplemental complaint was served, and a second injunction order was obtained. There seems to have been no attention given below, as to what was the status of the first injunction order after the second was obtained, nor was there on this appeal.
The argument of the motion as to both orders was brought on on the same day, and was made after the service of supplemental complaint, at least upon the defendant, the American Union Telegraph Company. For the purpose of giving my opinion, it is not necessary to say more than that as the supplemental complaint superseded the original complaint, the validity of the injunction orders must be examined in view of the supplemental complaint. This supplemental complaint contained reference to the allegations of the original complaint, and these may for this purpose be considered as incorporated in the supplemental complaint. The first or original complaint was framed when the plaintiffs were in possession of the wires and poles, and the relief it asked was, that the defendant, the Baltimore and Ohio R. R. Co. be enjoined from interfering with that possession, and also that there be an accounting. The supplemental complaint was framed after the Baltimore and Ohio Railroad Company had taken possession of the wires and poles, in violation of first injunction order, as the supplemental complaint the alleged. It proceeded to charge that this was done in pursuance of a combination between the two defendants. It alleged that, in pursuance of the combination, the defendants did, “ in violation of the injunction order aforesaid, which was well known at that time to both *423 of said defendants, take possession of the lines of the plaintiff, which are more particularly described in the complaint herein, upon and along the railways belonging to and operated by the defendant, &c., and cut the said wires of this plaintiff, or which were operated by it, and connected them with the wires of the defendant, the American Union Telegraph Company, and did break up and interfere with and disturb the connections heretofore existing, &c., to the great damage of this plaintiff to the amount already of at least twenty-five thousand dollars,” also, “the defendants will, unless restrained by the injunction order of this court, continue their unlawful interference with the peaceable possession and operation by the plaintiff of its telegraph lines and wires aforesaid, and will continue to interfere with and disturb and prevent its telegraphic connections aforesaid.” “Wherefore, this plaintiff prays that it may be adjudged, that the defendants, &c., be perpetually enjoined from indirectly or directly interfering with or taking possession of the said several lines of telegraph, &c., that a preliminary injunction be granted, &c., to the same effect as hereinbefore prayed for in regard to such perpetual injunction,” and “ that they may be required and directed to deliver up possession of said lines of telegraph to this plaintiff, and to pay to this plaintiff such damages as it may heretofore have sustained, or may hereafter sustain, by reason of the unlawful acts in this supplemental complaint averred.”
The second injunction order, obtained upon this supplemental complaint, was, that both defendants be enjoined “from directly or indirectly interfering with, or taking possession of any lines of telegraph or telegraphic wires heretofore operated by the plaintiff, along or upon any of the lines of railway belonging to the Baltimore and Ohio Railroad Company, or in connection with its own railway, or from preventing *424 the plaintiff from operating the same in connection with its other lines.”
We can see clearly, from this particular statement, that under sections 603 and 604, the only act, which, if done during the pendency of the action, would produce injury to the plaintiff or tend to render the judgment ineffectual, is the defendants taking or keeping possession of the telegraphic wires and poles. The acts enjoined, if done, would not affect the accounting or the judgment for damages. The first question, then, is, is the plaintiff entitled to a judgment, that the defendants be perpetually enjoined from taking possession of wires and poles, that, if not real estate, are fixtur.es for the purposes of this litigation,' and are not within the territorial jurisdiction of this State?
I am constrained to believe that this court has no direct jurisdiction over the possession of property situated elsewhere. Wherever courts of equity have taken jurisdiction of actions that concerned real estate in another territory, they have almost uniformly disclaimed the right to make a decree that directly and proximately affected the title or the actual possession. In actions for specific performance, the courts in equity compelled the party to perform his contract, e. g., by giving a deed, which might be competently given anywhere, and avowed that its jurisdiction stopped there, and that it did not pretend to pass upon the fact of title or possession. There never was a case where the court, in addition to decreeing the deed, decided or decreed what should be done under the deed, outside of its territorial jurisdiction.
I think there would be no doubt of this if attention were confined, as it should'in strictness be, to the supplemental complaint. The first relief demanded, that the defendants should be enjoined from taking possession of the wires, was inappropriate, in view of the allegation that the defendants had already taken *425 possession of the wires, except as viewed in connection with the further relief asked, that the defendants be required and directed to deliver up possession of said lines of telegraph to this plaintiff. I do not think it * would be argued that the court had power to make such a judgment.
It may be supposed, however, that the court might refuse to make any decree as to the possession, but would bind the parties by making it their obligation to obey an injunction order or judgment. If this could be done, the scruples of courts of equity, against acting on title and possession, would have been ineffectual to restrain them, for they could have decreed injunctions as to the title or the possession, wherever the defendants had been served with subpoena.
There is an authority which would prevent the court making this judgment of perpetual injunction. According to People v. Central R. R. Co. of N. J., the courts of this State have no power to enforce it against the principal defendant, the Baltimore and Ohio Railroad Co. In that case, Judge Smith said, delivering the opinion of the court (42 N. Y. p. 306):
“ The defendants are a corporation organized under the laws of Ifew Jersey, and must be deemed non-residents of this State. This judgment, therefore, cannot be enforced by process of attachment and proceedings as for a contempt, as against citizens of this State. Such an attempt and proceeding would obviously prove utterly abortive.”
The very highest authority has made the distinction adverted to, viz.: that the court will not act immediately upon title or possession. Penn v. Baltimore (1 Ves. 444, a. d. 1780) is the foundation case of the law, as to the power of courts in equity, in regard to land out of their jurisdiction. It is unnecessary to state the facts of this familiar case. It is enough to remember that Lord Hardwicke had decreed that the *426 parties should specifically perform the articles concerning the boundaries, and that releases should be given. Then, “His lordship having directed that the plaintiffs and defendants should quietly hold according to the articles, altered that, for it would be improper to have a decree in this court for quiet enjoyment of lands in America, which would occasion continual application to this court for contempt, &c., that it ought to be the proper jurisdiction.” Muller v. Bowes (94 U. S. 444), points out the limitation of jurisdiction. The court below had decreed a foreclosure of a mortgage upon real estate which was, in fact, out of the territorial jurisdiction of the court. The supreme court, Mr. Justice Strong giving the opinion, affirmed the jurisdiction of the court below, but-evidently not on the ground that the court had jurisdiction directly over the real estate, or the title or the possession of it. Such a proposition had never been made. If there was jurisdiction it would have been enough for the court to decree a. sale, and that its master should enforce the decree by executing a deed. But, as the master was only an officer or agent of the court, such a proceeding would be an immediate and direct exercise of power by the court over the real estate; and, therefore, the decree was supported by the provisions in it, that the parties in interest who had the title, should transfer it by proper conveyances to the persons buying at the sale, to whom the master should make the deed. Mr. Justice Strong said, “It is here undoubtedly a recognized doctrine, that a court of equity sitting in a State and having jurisdiction of the person, may decree a conveyance by him of land in another State, and may enforce the decree by process against the defendant. True, it cannot send its process into that other State, nor can it deliver possession of land in another jurisdiction, but it can command and enforce a transfer of the title.” I have no *427 doubt that the learned judge meant that the court could command the parties to do that within its jurisdiction, which, according to the agreement of the parties, or the circumstances which made the equitable cause of action before the court, it was the intent of the parties should be done to transfer the title, or which it was their equitable obligation to do towards that end. Mr. Justice Strong then says : “ And there seems to be no reason why it cannot, in a proper case, effect the transfer by the agency of the trustees, where they are complainants.” “The mortgagors here were within the jurisdiction of the court. So were the trustees of the mortgage. It was at the instance of the latter the master was ordered to make the sale. The court might have ordered the trustees to make it. The mortgagors who were foreclosed were enjoined against claiming property after the master’s sale, and directed to make a deed to the purchaser in further assurance. And the court can direct the trustees to make a deed to the purchaser in further assurance.” The limitation of the powers of the court in the respect which we have in view, is clearly recognized. The cited case, it must be said, is applicable only to its particular circumstance. If there were, in fact, parties entitled to redeem by virtue of liens upon land out of the jurisdiction of the court, it would be difficult to say, under the law of New York, that they would be foreclosed by a proceeding like that in Muller v. Dows.
What has been said convinces me that the complaint did not show that the plaintiff was entitled to a judgment, restraining the defendant from the things specifically enjoined by the temporary injunctions, and that the temporary injunction did not enjoin the doing of things which would render ineffectual the judgment the plaintiff was entitled prima facie to obtain.
In the other matters which have been passed upon by Judge Freedman, I also agree with him, and concur in his disposition of the appeal.